IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AR NETWORK, LLC, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>WIRELESS GUARDIAN, et al.,<br><br>   Defendants. | CIVIL ACTION<br>NO. 25-1447 |

**OPINION**

**Slomsky, J.**                                                   **April 10, 2026**

**TABLE OF CONTENTS**

I.    **INTRODUCTION**.................................................................................................... 5

II.   **BACKGROUND** ..................................................................................................... 6

   A.   Parties.................................................................................................................. 6

   B.   Factual Background ............................................................................................ 9

      a.   The Scheme: An Overview ........................................................................... 9

      b.   Pacific Outdoors and JPC Solicit Plaintiffs to Purchase Boxes................... 10

      c.   Data Tech Emerges as the Primary Reseller ................................................ 14

      d.   Tension Between Plaintiffs, Data Tech, and WG.......................................... 16

      e.   The WG Ponzi Scheme Unravels in the Summer of 2024........................... 17

   C.   Procedural History ............................................................................................. 19

III.  **STANDARD OF REVIEW**.................................................................................... 20

   A.   Subject Matter Jurisdiction ............................................................................... 21

1

B.   Personal Jurisdiction ............................................................................................... 22

C.   Failure to State a Claim Upon Which Relief Can Be Granted.................................... 24

IV.  ANALYSIS................................................................................................................... 25

A.   Subject Matter Jurisdiction ...................................................................................... 25

B.   Personal Jurisdiction ................................................................................................ 27

    a.   RICO Claims (Counts IV and V).................................................................... 27

        i.   Relevant Law: Section 1965(b) and Minimum Contacts........................... 27

        ii.  Analysis: Personal Jurisdiction for RICO Claims ................................... 30

            1.   Data Tech Defendants (Data Tech, Michael Boothe, and David Boothe) ............ 30

            2.   James Cunningham ....................................................................... 35

            3.   United Defendants (Eric Howlett and United Electric) ....................................... 37

    b.   State Law Claims (Counts I, II, III, VI, VII, VIII, IX) .................................... 38

        i.   Relevant Law: Pendent Personal Jurisdiction............................................ 39

        ii.  Analysis: Personal Jurisdiction for State Law Claims............................... 41

C.   RICO Claims (Counts IV and V)............................................................................... 43

    a.   Rico Claim #1: 18 U.S.C. § 1962(c) ("Section 1962(c)") ............................. 44

        i.   Relevant Law: Section 1962(c)................................................................. 44

            1.   "Conduct or Participate" .............................................................. 44

            2.   "Enterprise"................................................................................. 45

            3.   "Pattern of Racketeering Activity" ............................................... 45

        ii.  Analysis: Section 1962(c)......................................................................... 47

1.    Association-in-Fact Enterprise.................................................................. 48

    a.    The "Persons" Are Not the Same as the "Enterprise"....................................... 49

    b.    The Enterprise Has an Existence Separate from the Racketeering Activity..... 51

    c.    The Enterprise is a Continuing Unit ................................................................. 55

2.    "Conduct or Participate"........................................................................... 59

3.    Racketeering Activity................................................................................ 62

b.    RICO Claim #2: 18 U.S.C. § 1962(d) ("Section 1962(d)")........................................ 71

    i.    Relevant Law: Section 1962(d) ................................................................. 71

    ii.    Analysis: Section 1962(d)........................................................................... 71

D.    State Law Claims (Counts I, II, III, VI, VII, VIII, IX) ...................................................... 74

a.    Fraudulent Misrepresentation and Concealment (Counts I, II) ..................................... 74

    i.    JPC Fraud (Count I)..................................................................................... 75

        1.    James Cunningham ................................................................................ 75

            a.    Misrepresentations ......................................................................... 76

            b.    Concealment ................................................................................... 78

        2.    JPC Defendants..................................................................................... 78

    ii.    Data Tech Fraud (Count II)......................................................................... 82

        1.    James Cunningham ................................................................................ 82

        2.    Data Tech Defendants and United Defendants ..................................... 83

b.    Negligent Misrepresentation (Count III) ........................................................................ 85

c.    Breach of Contract (Counts VI, VII) .............................................................................. 87

     i.    JPC Breach of Contract (Count VI) ............................................................. 87

    ii.    Data Tech Breach of Contract (Count VII) ................................................. 88

  d.    Aiding and Abetting Fraud (Count VIII) ......................................................... 90

  e.    Civil Conspiracy (Count IX) .......................................................................... 92

V.   **CONCLUSION** ................................................................................................... 95

## I.    INTRODUCTION[1]

This case arises from an alleged "Ponzi" scheme[2] orchestrated by Defendant Wireless Guardian, Inc. ("WG"), a security and technology company, to defraud investors by selling outdoor electronic devices referred to as Boxes. (Doc. No. 67 ¶ 40.)  Placed on roadside billboards and private buildings, Boxes apparently were equipped with technology capable of collecting license plate and cellphone data from passing vehicles.  (Id.)  Plaintiffs AR Network LLC, A&R Enterprises LLC, and Teometrix LLC (collectively, "Plaintiffs") allege that WG—along with its employees and affiliates—induced Plaintiffs to purchase Boxes with misrepresentations.  Most importantly, WG and other Defendants told Plaintiffs that Intel Corporation ("Intel") contracted with WG to purchase data collected from Boxes.  Under that impression, Plaintiffs purchased Boxes either directly from WG or from other Defendants in this case, all of whom Plaintiffs claim were either principals, agents, or resellers of WG.  As a result, Plaintiffs sued Defendants for violating the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act and state common law causes of action.

---

[1]   The facts in this Opinion are sourced from the First Amended Complaint ("FAC") (Doc. No. 67) and are taken as true at this stage of the litigation.  Plaintiffs also filed in this case a RICO Case Statement (Doc. No. 68), which will be referenced in this Opinion too.  See Glessner v. Kenny, 952 F.2d 702, 712 n.9 (3d Cir. 1991) ("Courts may consider the RICO case statements in assessing whether plaintiffs' RICO claims should be dismissed.")

[2]   A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors.  Its organizers often promise to invest money and generate high returns with little or no risk.  But in many Ponzi schemes, instead of investing the new money, the fraudsters use the money collected from new investors to pay those who invested earlier and often keep some proceeds for themselves.  U.S. Securities and Exchange Commission, Ponzi Scheme, INVESTOR.GOV, https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme (last visited Apr. 1, 2026).

In the First Amended Complaint ("FAC"), Plaintiff brings the following claims:  (1) fraudulent misrepresentations and concealment against all Defendants (Counts I and II)[3];  (2) negligent misrepresentation against all Defendants (Count III);  (3) violation of the RICO Act under 18 U.S.C. 1962(c) against all Defendants (Count IV);  (4) conspiracy to violate the RICO Act under 18 U.S.C. 1962(d) against all Defendants (Count V);  (5) breach of contract against Defendant JPC Outdoor Advertising, LLC and Data Tech Global LLC (Counts VI and VII);  (6) aiding and abetting fraud against all Defendants (Count VIII);  and (7) civil conspiracy against all Defendants.

From a total of fourteen (14) Defendants in this case, eleven (11) Defendants—arranged into four (4) groups—moved to dismiss the FAC.[4]  Before the Court are those four Motions to Dismiss.  Moving Defendants raise multiple grounds for dismissal, but they largely focus on lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

For reasons that follow, Moving Defendants' Motions to Dismiss will be denied.

## II.    BACKGROUND

### A. Parties

Plaintiffs AR Network LLC, A&R Enterprises LLC, and Teometrix LLC are Pennsylvania corporations owned and operated by two principals.  (See Doc. No. 67 ¶ 11 n.1.)  Plaintiffs'

---

[3]   Plaintiffs break up the two Counts of fraudulent misrepresentation and concealment to target two different—though partially overlapping—groups of Defendants.

[4]   Three Defendants not moving to dismiss the Complaint are (1) WG, (2) WG's sister company, Southeastern Wireless Solutions LLC ("SWS"), and (3) Dwayne Ratliff, WG's co-founder and a principal at SWS.

principals are "real estate and land use attorneys with their own practice in Philadelphia, Pennsylvania."[5] (Id. ¶ 62.) Plaintiffs claim they were the target of a Ponzi scheme directed by WG and resellers and an installer of WG's technology (the "WG Ponzi scheme"), which led them to spend more than six (6) million dollars for Boxes. (Id. ¶ 4, 56.)

Five groups of Defendants play key roles in Plaintiff's FAC.

- The first group is comprised of Wireless Guardian Inc. ("WG"), Southeastern Wireless Solutions LLC ("SWS"), and Dwayne Ratliff (collectively, "Wireless Defendants"). As mentioned above, Defendant WG—the corporate entity essentially at the center of the dispute—is a security and technology company that sold Boxes capable of obtaining data from traveling vehicles on public roads. (Id. ¶ 12.) WG is a Delaware corporation with its principal place of business in Louisiana. (Id.) SWS is a sister company of WG that "routinely comingled funds[,] property[,] and other assets with [WG]." (Id. ¶ 13.) For his part, Dwayne Ratliff played a substantial role in both corporate entities; he is a co-founder, board member, and Chief Financial Officer at WG, and is "an executive, director, and principal at SWS." (Id. ¶ 14.) Ratliff resides in Georgia. (Id.) Jason Dumas, who co-founded WG with Ratliff but is not a Defendant in this case, "disappeared or committed suicide" after the WG Ponzi scheme was revealed to investors.[6] (Id. ¶ 6.) As noted above, none of the Wireless Defendants moved to dismiss Plaintiff's FAC.

- The second group consists only of one Defendant: James Cunningham. James Cunningham was an officer at WG, first as Vice President of Intelligence and Security until 2023, then as

---

[5]    These corporate entities and their principals are referred to as "Plaintiffs."

[6]    Jason Dumas "has not been located . . . and is a missing person." (Doc. No. 67 ¶ 6)

Chief Information Officer, and finally as Chief Executive Officer until 2024.  (Id. ¶ 15, 53.) He is a resident of Virginia.

- The third group includes Defendants JPC Outdoor Advertising LLC ("JPC"), Pacific Outdoor Advertising LLC ("Pacific Outdoor"), Joseph Jacobs, Barry Caldwell, and Anthony Amado (collectively, "JPC Defendants").  JPC and Pacific Outdoor were "owned and operated by the same" principals, including Jacobs, Caldwell, and Amado.  (Id. ¶ 19, 20.) Plaintiffs allege that JPC Defendants were middlemen in the WG Ponzi scheme who resold WG's Boxes and solicited Plaintiffs for investments.  (Id. ¶ 20).  Joseph Jacobs, Barry Caldwell, and Anthony Amado reside in New Jersey.

- Like the JPC Defendants, the fourth group is a mix of a corporate entity and its principals who were allegedly middlemen between WG and Plaintiffs, including Defendants Data Tech Global LLC ("Data Tech"), David Boothe, and Michael Boothe (collectively, "Data Tech Defendants").  David Boothe and Michael Boothe were principals of Data Tech, which, in turn, was an "authorized Reseller of Boxes" for WG.  (Id. ¶ 25–27.)  David Boothe is a resident of Florida, Michael Boothe is a resident of Wisconsin, and Data Tech is headquartered in Wisconsin.

- Finally, the fifth group includes United Electric, Inc. ("United Electric") and its President, Eric Howlett (collectively, "United Defendants").[7]  (Id. ¶ 18.)  Headquartered in Wisconsin, the United Defendants did not resell WG's Boxes, but instead installed and repaired Boxes. (See id. ¶ 17.)

---

[7]  According to the FAC, David and Michael Boothe assisted in operating United Electric too. (Id. ¶ 18, 26, 27.)

B. **Factual Background**

a. **The Scheme: An Overview**

As noted above, WG sold Boxes that allegedly captured license plate data and collected "certain non-personal data from the cell phones and other devices that were inside vehicles that drove by the location of Boxes." (Doc. No. 67 ¶ 41.) Those who purchased Boxes from WG were known as "End Users,"[8] and would pay fees to reserve property adjacent to thoroughfares where Boxes would be placed. (Id. ¶ 43.) The WG Ponzi scheme also involved a series of middlemen, known as "resellers," who directly solicited Plaintiffs and other End Users. (Id. ¶ 44.) The resellers "operated two entities, JPC and Data Tech, for the sole purpose of extracting money from Plaintiffs and other End Users." (Id. ¶ 58.) United Electric and its President, Eric Howlett, would install Boxes purchased by the End Users. (Id. ¶ 43.)

Central to WG's and Resellers' pitch to induce End Users to purchase Boxes for placement at reserved locations was what they branded as the "Pattern of Life Program." (Id. ¶ 46.) The Pattern of Life Program was based on WG's representations that it "had a contract with Intel whereby Intel agreed to purchase the data at a rate of $0.015 per unique piece of customer data." (Id.) Plaintiffs allege that the contract with Intel never existed. Instead, WG's Pattern of Life Program, which allegedly relied on the monetization of data captured by the Boxes, was solely supported by new investments from End Users, such as Plaintiffs, who purchased Boxes. (Id. ¶ 48.) After securing payments from Plaintiffs and other End Users, Defendants would "siphon[] off millions of dollars" to personal bank accounts or related corporate entities, such as Defendant SWS, to "shield Defendants' ill-gotten gains from suits like this." (See id. ¶ 50, 51, 59, 60.) Overall, the FAC alleges that the WG Ponzi scheme had an enterprise, which "had an informal

---

[8]    Plaintiffs are End Users.

hierarchical structure," involving (1) WG, its principals, and its affiliates as the coordinators of the scheme, (2) JPC, Pacific Outdoors, and Data Tech as resellers, and (3) United Electric and Eric Howlett as installers and repairers of Boxes. Plaintiffs and other End Users were the victims, who purchased Boxes and locations reserved for placement of the Boxes, and who unwittingly underwrote the entire scheme. (Id. ¶ 60.)

### b. Pacific Outdoors and JPC Solicit Plaintiffs to Purchase Boxes

A Fourth of July party in 2022 marked the genesis of Plaintiffs' relationship with Defendants. At a seaside resort town in New Jersey, Plaintiffs met Defendant Joseph Jacobs—a principal of Defendants Pacific Outdoor and JPC—who introduced himself as "a former land use attorney" and "political power player" in New Jersey. (Doc. No. 67 ¶ 62.) In January 2023, Plaintiffs returned to New Jersey to meet with Joseph Jacobs at his vacation home to discuss land development. (Id. at 63.) During that meeting, Jacobs pitched another business opportunity to Plaintiffs: participation in WG's Pattern of Life Program. (Id. ¶ 63.) To induce Plaintiffs to invest in this venture, Jacobs touted Intel's purported agreement to purchase data from the Boxes and mentioned the possibility of a secondary market for the data, in which other large corporate entities would purchase that same data from Intel. (Id. ¶ 64.) In April 2023, Jacobs invited Plaintiffs to his New Jersey home for an event with state politicians. (Id. ¶ 66.) At the event, Jacobs encouraged Plaintiffs to purchase Boxes. To generate interest, he mentioned that "Blackstone and other hedge funds" were going to purchase Boxes. (Id.) Jacobs repeated his solicitation of Plaintiffs the next month at a cocktail reception in New Jersey. (Id. ¶ 67.)

Throughout the summer and fall of 2023, Joseph Jacobs' solicitation of Plaintiffs persisted. When Plaintiffs asked Jacobs his opinion on certain properties where the Boxes would be installed, Jacobs told Plaintiffs they "are going to make some money," and that the WG opportunity was

10

"life changing."  (Id. ¶ 68, 78.)  Later, Jacobs sent Plaintiffs a "form of lease" to use when negotiating Box locations with property owners.  (Id. ¶ 74.)  At another in-person event in New Jersey, Jacobs introduced Plaintiffs to his business partners, Defendants Barry Caldwell and Anthony Amado, who were also involved in WG's Box business.  (Id. ¶ 69–70.)  Together, these three Defendants created an entity called JPC.  (Id. ¶ 83.)

Joseph Jacobs sent emails and texts to Plaintiffs to convince them of WG's profitability. First, he texted Plaintiffs a screenshot purporting to show that his company, Pacific Outdoors, made tens of thousands of dollars every month from data monetization.  (Id. ¶ 72, 79.)  Plaintiffs characterize this screenshot as misleading because the source of the money was not from data monetization, but instead from new investments in the WG Ponzi scheme by End Users.  (Id. ¶ 73.)  Second, Joseph Jacobs texted Plaintiffs a screenshot of "what appeared to be a slide deck from Intel," showing that WG was partnering with other large corporations, like Lockheed Martin and IKEA.  (Id. ¶ 75.)  Third, Joseph Jacobs forwarded Plaintiffs an email from Defendant Dwayne Ratliff, who "falsely represented" that the unit price for each piece of customer data would increase if End Users collected more data.  (Id. ¶ 76.)  As a result of Jacobs' efforts, Plaintiffs ultimately agreed to purchase WG's Boxes from Jacobs' entities in August 2023.  (Id. ¶ 77.)

In September, Joseph Jacobs hosted an event at his New Jersey home that—in addition to Plaintiffs and other End Users—had in attendance:  (1) Dwayne Ratliff, the founder and CFO of WG, (2) Michael Boothe, who was both a reseller with Data Tech and an operator of United, the company that installed Boxes, and (3) Anthony Amado, a JPC colleague of Joseph Jacobs who Plaintiff had previously met.  (Id. ¶ 82.)  At the event, Michael Boothe personally solicited Plaintiffs to purchase Boxes directly from him instead of from Jacobs and Jacobs' related corporate

entities, Pacific Outdoors and JPC.[9]  (Id.)  After Jacobs offered a lower price per Box to Plaintiffs than he had previously offered, Plaintiffs confirmed their intention to purchase fourteen (14) Boxes again from JPC.  (Id. ¶ 83, 85.)  To complete the purchase, Anthony Amado, the business partner of Joseph Jacobs, instructed Plaintiffs to "create a new entity for these transactions," assuring them that Michael Boothe of Data Tech, Dwayne Ratliff, and Joseph Jacobs "worked together" to design a "process for all [of Plaintiffs'] deals."  (Id. ¶ 86.)  Finally, on September 24, 2023, Plaintiffs consummated a verbal contract with JPC, in which (1) Plaintiffs would purchase fourteen (14) Boxes at a price of $115,000 per unit, and (2) JPC would ensure delivery and installment within forty-five (45) days.  (Id. ¶ 87.)  Three days later, Plaintiffs purchased an additional six (6) Boxes for the same unit price, which brought the total purchase to $2,290,000.  (Id.)

On October 26, 2023, Plaintiffs attended a fundraiser at an Atlantic City casino with Defendants James Cunningham, Michael Boothe, Joseph Jacobs, Barry Caldwell, and Anthony Amado.  (Id. ¶ 91.)  At the fundraiser, James Cunningham—at that time the Chief Information Officer of WG responsible for "all sales and data"—met Plaintiffs and told them that WG's Pattern of Life Program was "real and profitable."  (Id. ¶ 92.)  Additionally, Defendants Michael Boothe and Joseph Jacobs used the fundraiser to "feign a false sense of urgency . . . to induce capital contributions" from Plaintiffs.  (Id. ¶ 93.)  Specifically, Michael Boothe received a phone call from Dwayne Ratliff, who told Michael Boothe that a prominent chain of convenience stores planned to purchase all remaining Boxes from WG.  (Id.)  Michael Boothe relayed this information to Plaintiffs.  Nevertheless, Michael Boothe assured Plaintiffs they could still purchase additional Boxes through him because he had "special clout" with Dwayne Ratliff.  (Id.)  The day after the

---

[9]    On October 10, 2023, Michael Boothe tried to coax Plaintiffs to purchase Boxes from him by texting them revenue statements purporting to show Boothe earning tens of thousands of dollars from Boxes in one month alone.  (Id. ¶ 88.)

fundraiser, Joseph Jacobs and Michael Boothe told Plaintiffs that Dwayne Ratliff decided to "set aside" 180 Boxes for Joseph Jacobs, Michael Boothe, and Plaintiffs. (Id. ¶ 94.)

In November 2023, Michael Boothe invited Plaintiffs to visit Wisconsin, the headquarters of Defendants United, the installer, and Data Tech, the reseller. (Id. ¶ 95.) Plaintiffs went to the Wisconsin headquarters on November 7 and 8, 2023. While there, Plaintiffs learned that Eric Howlett—President of United—and Michael Boothe, and David Boothe—principals of Data Tech—each had access to WG's internal computer system called HubSpot, which monitored Box sales and delivery. (Id. ¶ 96.) During the trip, Michael Boothe and Eric Howlett held a Zoom meeting from Wisconsin with (1) Dwayne Ratliff, who was in Georgia, and (2) Plaintiffs' close friends and family, who were in Pennsylvania. (Id. ¶ 97.) Michael Boothe, Eric Howlett, and Ratliff used the call to further advertise WG's Pattern of Life Program. (Id.) Additionally, Michael Boothe and Eric Howlett showed Plaintiffs more revenue statements, purporting to show millions in profits due to data monetization sourced from WG's Boxes. (Id. ¶ 98.)

When Plaintiffs returned from their Wisconsin trip, Joseph Jacobs lobbied Plaintiffs and their friends and family to purchase Boxes from him at an in-person meeting held on November 16, 2023. (Id. ¶ 99.) Though Jacobs had previously texted Plaintiffs a part of WG's alleged contract with Intel (See id. ¶ 90), this in-person meeting was the first time Plaintiffs saw a physical copy of the Intel agreement. (Id. ¶ 100.) Still, Plaintiffs aver (1) they had no "fair opportunity to read [the contract]" at the meeting, (2) the contract was heavily redacted, and (3) the contract was "misleading" for giving a false impression that Intel was purchasing data from WG. (Id. ¶ 90, 100.) After the meeting, Plaintiffs, WG, and JPC executed a revenue-sharing agreement for money derived from Box data collections.[10] (Id. ¶ 100.)

_____

[10]    According to the FAC, 50% of the revenue went to WG, 47.5% went to Plaintiffs, and

Plaintiffs received their first shipment of Boxes through the United States Postal Service ("USPS") in November 2023.  (Id. ¶ 102.)  Plaintiffs aver that Defendants United, Eric Howlett, Michael and David Boothe installed or directed the installation of this set of Boxes.  (Id.)  Initially, Plaintiffs' investment appeared lucrative, as they received payments of over $1.6 million from Data Tech and Pacific Outdoor.[11]  (Id. ¶ 103.)  On December 4, 2023, Plaintiffs purchased an additional thirteen (13) Boxes from JPC, bringing the total cost of Plaintiffs' Box purchases $3,785,000.  (Id. ¶ 104.)  Two months after this purchase, Barry Caldwell—a principal at JPC—claimed that Plaintiffs owed United, whose President was Eric Howlett, over $19,000 for unpaid installation fees despite the parties' verbal contract terms, which included not only a flat fee for the Boxes but also for their installation.  (Id. ¶ 119.)  Upon Barry Caldwell and Michael Boothe's insistence, Plaintiffs paid Eric Howlett these "unpaid" fees.  (Id.)

### c.  Data Tech Emerges as the Primary Reseller

Up until November 2023, JPC and its principals were the sole resellers of Boxes to Plaintiffs.  But Data Tech and its principals, Michael and David Boothe, would soon assume that lead role.  According to the FAC, Michael Boothe "routinely flaunted his close personal and professional relationship with Defendants Ratliff and Wireless Guardian," mentioning to Plaintiffs that he took weekly trips to Georgia, the home of both Ratliff and WG.  (Id. ¶ 108.)  Michael Boothe informed Plaintiffs during Plaintiffs' trip to Wisconsin in early November 2023, Joseph Jacobs was overcharging them for Boxes.  (Id. ¶ 110.)  The following month, Michael and David

---

2.5% went to JPC.  (Id. ¶ 100.)  Plaintiffs note that this revenue sharing agreement did not mention the purchase, sale, delivery, or installation of Boxes.  (Id.)

[11]  At the time of this payment, Plaintiffs had only purchased Boxes from JPC, the entity owned by Jacobs, Amado, and Caldwell, the principals of Pacific Outdoor.  Plaintiffs note that Data Tech paid Plaintiffs for purported data monetization generated from Boxes that Data Tech did not sell them.

Boothe, along with Eric Howlett, renewed their push in courting Plaintiffs to purchase Boxes from their entity, Data Tech.  On December 18, 2023, Michael Boothe "solicited Plaintiffs to contribute additional capital to the Ponzi scheme" at a restaurant in downtown Philadelphia, Pennsylvania. (Id. ¶ 111.)  Plaintiffs also allege that David Boothe and Eric Howlett, President of United, "traveled to Philadelphia in furtherance of the scheme to defraud Plaintiffs." (Id.)  The next night, Howlett and the Boothe brothers solicited Plaintiffs at a restaurant in Atlantic City, New Jersey. (Id.)  On December 23, 2023, Michael Boothe proposed to Plaintiffs on Microsoft Teams another WG data collection scheme, known as In-Store Media, which allowed End Users to capture data from customers at grocery stores.  (Id. ¶ 97, 112.)  On January 22, 2024, Dave Booth traveled to Philadelphia to meet with a respected mentor of Plaintiffs, later telling Plaintiffs about the meeting "to induce them to contribute additional capital to the scheme." (Id. ¶ 117.)  Days later, Michael Boothe visited Philadelphia again, soliciting Plaintiffs to meet for drinks near the airport.  (Id. ¶ 118.)  Eric Howlett and Michael Boothe even invited Plaintiffs to attend the 2024 Super Bowl with them, claiming to have "discounted seats" from WG. (Id. ¶ 122.)

To formalize Plaintiffs' relationship with Data Tech, Plaintiffs met Michael and David Boothe in Miami.   (Id. ¶ 113.)  During one Miami meeting, David Boothe told Plaintiffs that Michael Boothe's business with WG was profitable and "again falsely represented that [WG] was monetizing data."  (Id.)  As a result, Plaintiffs and Data Tech entered into a verbal contract, in which (1) Plaintiffs would pay $87,500 per Box, and (2) Data Tech would timely deliver and install Boxes. (Id. ¶ 114.)  However, on January 12, 2024, Michael Boothe unilaterally "amended" the verbal contract, charging Plaintiffs $100,000 for one Box set and $102,000 for "site holds" to reserve property for several Box installations.[12]  (Id. ¶ 115.)  And on February 8, 2024, Michael

---

[12]   On February 1 and 5, 2024, Michael Boothe sent an invoice for two additional Boxes at the

Boothe notified Plaintiffs of a more dramatic price increase, in which each Box would cost $170,000 by the end of February. (Id. ¶ 121.)    Michael Boothe justified the price increase by either stating that WG added new requirements for Box technology, or that demand for Boxes was high. (Id. ¶ 116, 121.)   Relying on Data Tech's representations about the Boxes' profitability and the increased demand for them, Plaintiff purchased six (6) additional Boxes between late February and early March 2024 for a total cost of $582,000, and purchased four (4) more Boxes on March 29, 2024. (Id. ¶ 124. 130.)  As Plaintiffs had done with JPC, Plaintiffs and Data Tech executed a revenue-sharing agreement for money derived from Box data collections.[13]  (Id. ¶ 123.)  United, the installer, also benefited from the new purchases from Data Tech, as Plaintiffs spent $1,500 per Box for installation. (Id. ¶ 125.)

### d.  Tension Between Plaintiffs, Data Tech, and WG

The $3,000 "site hold" for each location where the Boxes would be installed created tension between Plaintiffs and Data Tech.  Though originally characterized as a 90-day reservation when Plaintiffs purchased Boxes in January, Data Tech—operated by the Boothes—informed Plaintiffs in March that the reservations were only effective for 60 days. (Id. ¶ 127.)  Because 60 days had passed since Plaintiffs' January purchase, Plaintiffs would not be able to install Boxes at those locations. (Id.)  Additionally, Plaintiffs' late February-early March purchases of six (6) Boxes from Data Tech had yet to be delivered, causing David Boothe to assure Plaintiffs that he would contact

---

same price. (Id. ¶ 120.)  The "site hold" fees, which were $3,000 per Box, only lasted for 90 days. (Id. ¶ 125.)  After that time, the hold would lapse, and End Users would lose the right to install Boxes at that site. (Id.)

[13]  As noted earlier, according to the FAC, 50% of revenue went to WG, 47.5% went to Plaintiffs, and 2.5% went to Data Tech. (Id. ¶ 123.)  Plaintiffs note that this revenue sharing agreement did not mention the purchase, sale, delivery, or installation of Boxes. (Id.)

WG and Dwayne Ratliff directly.  (Id. ¶ 129.)  One important excuse given for the delays was that WG was "so overwhelmed with business that they were struggling to keep up."  (Id. ¶ 128)

On April 26, 2024, newly appointed WG CEO James Cunningham sent an introductory letter to WG End Users, in which he announced his new role, touted his involvement with the Pattern of Life Program "since its inception," and promised improvements in the company's "transparency, accountability, and responsiveness."  (Id. ¶ 130, Ex. F.)  Cunningham also used the letter to boast of new Box software that would lead to more lucrative data payments.  (Id.)  Building on Cunningham's letter, Michael Boothe informed Plaintiffs on May 20, 2024 that WG was, for a limited time, "offering Plaintiffs Boxes at a reduced price of $115,000 per Box."  (Id. ¶ 133.)  Even Joseph Jacobs, from whom Plaintiff had not purchased Boxes in months, texted Plaintiffs the day after Boothe's offer with exciting news.  Specifically, Jacobs sent a picture of himself with Speaker of the House Michael Johnson outside of the Union League in Philadelphia, stating that (1) Jacobs met with Johnson "regarding Wireless Guardian," (2) Johnson "completely supports" data collection efforts, and (3) "Wireless will be in play forever."  (Id. Ex. G.)  Encouraged by Michael Boothe's offer and Joseph Jacobs' assurances of WG's viability, Plaintiffs purchased two additional Boxes from Data Tech at $115,000 per Box.  (Id. ¶ 136.)  In total, Plaintiffs paid Data Tech $1,888,000 in 2024, but received no Boxes.  (Id. ¶ 137.)

### e.  The WG Ponzi Scheme Unravels in the Summer of 2024

On June 9, 2024, Plaintiff finally obtained from Joseph Jacobs a complete copy of WG's contract with Intel.  (Id. ¶ 138, Ex. B.)  The contract revealed that the premise underlying WG's business model—that WG was selling data collected from Boxes to Intel—was false.  Instead, Intel was selling its own "software and related Intel services" to WG.  (Id. ¶ 53, Ex. B.)  Two days later, CEO James Cunningham sent a letter from WG's Board of Directors to all WG resellers,

customers, and shareholders.  (Id. ¶ 139, Ex. H.)  In the letter, WG claimed that its relationship with Intel initially involved "passthrough payments from Intel to [WG]," but admitted that WG had not been monetizing its data to Intel "for some time." (Id.)  As a result, WG was merely inventorying its accumulated data and was actively seeking new purchasers.  (Id.)  The letter finished by noting that the decision to inventory data was made "solely by the Board of Directors and was not known to any other Wireless Guardian employees, managers, or executives."  (Id.) That week, James Cunnigham sent additional updates.

- First, Jason Dumas, who co-founded WG with Dwayne Ratliff, was reported missing after boarding a boat off the coast of Hawaii.  (Id. ¶ 140, Ex. I.)

- Second, Cunningham admitted that WG's Board had deceived investors and "were unable to realize financial gain from the data."  He pleaded for patience as he tried to fix the situation.  (Id. ¶ 141, Ex. J.)  On June 14, 2024, Cunningham acknowledged in a status update that WG "inflated [its] relationship with Intel."  (Id. ¶ 143, Ex. K.)

- In another update sent three days later, Cunningham went further, noting that Intel "is not interested in being a direct data purchaser" and was only a temporary "passthrough" entity. (Id. ¶ 144, Ex. L.)

In response, Plaintiffs unsuccessfully attempted to recoup their investments from JPC and Data Tech before having a Zoom call with Cunningham on July 3, 2024.  (Id. ¶ 148–49.)  During the call, Cunningham projected confidence by (1) telling Plaintiffs that WG was "days away from signing data purchasing contracts" with numerous buyers, and (2) guaranteeing immediate payments from one such buyer.  (Id. ¶ 150.)  When Plaintiffs never received those payments, they sent a demand letter to WG requesting repayment of over $5.8 million.  (Id. ¶ 151.)  But the money from the scheme was nowhere to be found.  Plaintiffs aver that WG and Dwayne Ratliff siphoned

"millions of Ponzi scheme profits" to WG's sister company, SWS.  (Id. ¶ 157.)  Though WG promised refunds to two other End Users and offered to post company property in Hawaii as collateral, WG never refunded money to those End Users. (Id. ¶ 160.)  Instead, SWS sold the Hawaii property to an unrelated third party and then executed mortgages—on property it no longer owned—in favor of the two other End Users.  (Id. ¶ 161–63.)

Finally, Plaintiffs allege that WG's fraud continued into 2025.  On August 30, 2024, WG proposed that it would repay End Users like Plaintiff through collaboration with DMRP, LLC—an entity which Plaintiffs allege was merely an agent for Defendants in this case.  (Id. ¶ 169.)  DMRP would act as a middleman between WG and End Users, working to facilitate repayment, revenue sharing, and timely delivery of Boxes.  (Id. ¶ 166.)  As a condition, however, if End Users agreed to the appointment of DMRP to help recoup their investments, End Users would "forfeit [their] legal right to sue Wireless Guardian or its agents."  (Id. ¶ 167.)  DMRP and its principals reached out to Plaintiffs with at least two data collection offers.  (Id. ¶ 168.)  The most recent solicitation from DMRP occurred on March 10, 2025. (Id. ¶ 169.)  No transactions through DMRP ever occurred between Plaintiffs and any Defendant.  In sum, Plaintiffs claim to have suffered losses from the WG Ponzi scheme of over $6 million.  (Id. ¶ 172.)

## C.  Procedural History

On March 18, 2025, Plaintiffs filed this action against Defendants.  (Doc. No. 1.)  After an original six groups of Defendants filed Motions to Dismiss, the Court scheduled a hearing on the Motions for July 17, 2025.  (Doc. No. 51.)  At the hearing, the Court granted Plaintiffs leave to file an Amended Complaint and a RICO Case Statement.  (Doc. Nos. 63, 64.)  Plaintiffs filed their First Amended Complaint ("FAC") and RICO Case Statement on August 5, 2025, narrowing the range of Defendants to fourteen as compared to sixteen in their original

Complaint.  (Doc. Nos. 67, 68.)  On August 25 and 26, 2025, the following four groups of

Defendants filed Motions to Dismiss: (1) United and Eric Howlett ("United Defendants") (Doc.

No. 79);  (2) James Cunningham (Doc. No. 81);  (3) JPC, Pacific Outdoor, Anthony Amado,

Barry Caldwell, and Joseph Jacobs (collectively, "JPC Defendants") (Doc. No. 82);  and (4) Data

Tech, David Boothe, and Michael Boothe (Doc. No. 84) ("Data Tech Defendants).[14]

In September 2025, Plaintiffs filed Responses in Opposition to the Motions to Dismiss of

United Defendants (Doc. No. 91), James Cunningham (Doc. No. 92), JPC Defendants (Doc. No.

93), and Data Tech Defendants (Doc. No. 94).  On September 15, 2025, United Defendants filed

a Reply.  (Doc. No. 95.)  The next day, James Cunningham filed his Reply (Doc. No. 96), as well

as JPC Defendants (Doc. No. 97) and Data Tech Defendants (Doc. No. 98).  The Motions to

Dismiss (Doc. Nos. 79, 81, 82, 84) are now ripe for disposition.

## III.    STANDARD OF REVIEW

In their Motions to Dismiss, the four groups of Moving Defendants raise three grounds

for dismissal:  (1) lack of subject matter jurisdiction under Federal Rule of Civil Procedure

12(b)(1);  (2) lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2);  and

(3) failure to state a claim upon which relief can be granted under Federal Rule of Civil

Procedure 12(b)(6).

---

[14]  Two groups of Defendants also filed separate Responses to Plaintiffs' RICO Case
Statement:  (1) JPC Defendants (Doc. No. 83) and (2) Data Tech Defendants (Doc. No. 85).
Cunningham's Response is set forth in his Motion to Dismiss.  (Doc. No. 81.)  As noted
earlier, Defendants WG, SWS, and Dwayne Ratliff did not move to dismiss the FAC.  Of
those three Defendants, only Ratliff has filed an Answer to the FAC.  (Doc. No. 100.)

### A.  Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) permits a defendant to move for dismissal on the ground that the Court lacks subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "At issue in a Rule 12(b)(1) motion is the court's very power to hear the case."  Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d Cir. 2006) (internal quotation marks omitted).  A district court considering a facial challenge to subject matter jurisdiction under Rule 12(b)(1) must view the allegations of the complaint as true and consider only those allegations in the complaint and the attached documents in deciding whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000); see also U.S. ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (terming a facial attack as "an alleged pleading deficiency.").

For federal courts to have subject matter jurisdiction over a civil action, they must have either federal question jurisdiction, pursuant to 28 U.S.C. § 1331, or diversity of citizenship jurisdiction, pursuant to 28 U.S.C. § 1332.  See Graham v. Valley Forge Mil. Acad. & Coll., No. CV 19-1362, 2019 WL 6337717, at *3 (E.D. Pa. Nov. 27, 2019).  In this case, both bases for jurisdiction are relevant.  Under federal question jurisdiction, district courts have original subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  To establish this type of subject matter jurisdiction, a federal claim for relief must be asserted on the face of the complaint.  Rockefeller v. Comcast Corp., 424 F. App'x 82, 83 (3d Cir. 2011).  In this case, Plaintiffs assert two causes of action arising under Title 18, United States Code, Section 1962(c) and (d), parts of the Racketeer Influenced and Corrupt Organizations ("RICO") Act.  The RICO Act also provides:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . .

18 U.S.C § 1964(c).  Thus, RICO claims fall within federal question jurisdiction.

Additionally, district courts have subject matter jurisdiction over cases where the parties have diversity of citizenship and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a).  Section 1332(a) provides, in pertinent part:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between— citizens of different States  . . .

28 U.S.C. § 1332(a).  State law claims can also fall within a federal court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.

### B.  Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) permits dismissal of a defendant from a case when a court does not have personal jurisdiction over him or her.  "Once challenged, the plaintiff bears the burden of establishing personal jurisdiction."  O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) (internal citation omitted).  To show personal jurisdiction, the plaintiff may rely on the allegations in the complaint, affidavits, or other evidence.  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009).  If the court chooses not to conduct an evidentiary hearing, the plaintiff need only demonstrate a prima facie case of jurisdiction to defeat a motion to dismiss.  Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992) (citations omitted).  In deciding a motion to dismiss for lack of personal jurisdiction, the Court must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  Id.

In this case, there are three asserted bases for personal jurisdiction over Defendants, none of whom are domiciled or incorporated in Pennsylvania.  The first basis for personal jurisdiction arises when a federal statute authorizes personal jurisdiction over an out-of-state defendant for a federal claim.  See Laurel Gardens, LLC v. Mckenna, 948 F.3d 105, 113 (3d Cir. 2020) (citing Fed. R. Civ. P. 4(k)(1)(C)).  In this case, the authorizing federal statute is contained in the RICO Act, specifically 18 U.S.C. § 1965(b), which provides:

> In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).

The second basis for personal jurisdiction is pendent personal jurisdiction, which is related to—but distinct from—the first basis.  Even if a court has personal jurisdiction over an out-of-state defendant for a federal claim, a court does not necessarily have personal jurisdiction over the same defendant for state law claims in the same case.  Enter pendent personal jurisdiction.  For a court to exercise pendent personal jurisdiction over an out-of-state defendant for state law claims, two elements are necessary: (1) a federal statute must authorize personal jurisdiction over an out-of-state defendant for a federal claim, such as noted in the RICO Act above, and (2) a plaintiff's state claims must be "so related to" the federal claim, such that factors like judicial economy, convenience, and fairness to the litigants weigh in favor of hearing the federal and state claims together.  Laurel Gardens, LLC v. Mckenna, 948 F.3d 105, 123–24 (3d Cir. 2020) (citing 28 U.S.C. § 1367(a); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).

The third basis for personal jurisdiction is the traditional minimum contacts test, which involves a three-step inquiry.  First, a plaintiff must plead enough facts to show Defendants

"purposefully established 'minimum contacts' in the forum State." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985). Second, the court must determine whether the litigation "arise[s] out of or relate[s] to" at least one of those contacts. <u>Helicopteros Nacionales de Columbia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984). Third, if the first two requirements have been met, the court may consider whether exercising personal jurisdiction over the defendant "comport[s] with 'fair play and substantial justice.'" <u>Burger King Corp.</u>, 471 U.S. at 476 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 320 (1945)).

### C. Failure to State a Claim Upon Which Relief Can Be Granted

Lastly, the motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). After <u>Iqbal</u> it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. <u>Id.</u> at 678; <u>see</u> <u>also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Tatis v. Allied Interstate, LLC</u>, 882 F.3d 422, 426 (3d Cir. 2018) (quoting <u>Iqbal</u>, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (quoting <u>Iqbal</u>, 556 U.S. at 678).

Applying the principles of <u>Iqbal</u> and <u>Twombly</u>, the Third Circuit Court of Appeals in <u>Santiago v. Warminster Township</u> set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts:  "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted).  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

## IV.   ANALYSIS

### A.  Subject Matter Jurisdiction

Plaintiffs submits that the Court has subject matter jurisdiction over their claims for two reasons.  (Doc. No. 67 ¶ 30–32.)  First, Plaintiffs claim that the Court has subject matter jurisdiction because their civil action "arises under the laws of the United States."  (Doc. No. 67 ¶ 30.)  Specifically, Plaintiffs assert two causes of action against Defendants under the Racketeering Influenced and Corrupt Organizations ("RICO") Act.  They are violations of 18

U.S.C. § 1962(c), a substantive claim, and U.S.C. § 1962(d), a conspiracy claim.  The RICO Act

provides the following as a basis for subject matter jurisdiction:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . .

18 U.S.C § 1964(c) ("Section 1964(c)").  Here, in the FAC, Plaintiffs allege the two

violations of Section 1962 of the RICO Act, and Section 1964(c) grants the Court subject

matter jurisdiction over these two RICO claims.  In addition, the Court has subject matter

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, the supplemental

jurisdiction provision.

Furthermore, Plaintiffs also claim to have subject matter jurisdiction over all claims in the

case under diversity of citizenship jurisdiction.  According to the allegations in the FAC,

diversity of citizenship is satisfied for the following reasons:  (1) Plaintiffs are LLCs with their

members domiciled in Pennsylvania;  (2) Defendants are either individuals domiciled in other

states, corporations that are both incorporated in other states and have their principal place of

business in other states, or LLCs with members domiciled in other states; and (3) the amount in

controversy exceeds $75,000.[15]  Given these allegations in the FAC, Plaintiffs have sufficiently

alleged bases for subject-matter jurisdiction over the claims asserted in this case.

---

[15]  In United Defendants' Motion to Dismiss (Doc. No. 79), they "renew all arguments in their original Motion to Dismiss," which is listed on the Docket as Doc. No. 22.  One argument made in their original Motion to Dismiss is that Plaintiffs—all LLCs—failed to allege the citizenship of their members, so they could not establish subject matter jurisdiction based on diversity of citizenship jurisdiction.  (Id. at 29.)  Whether such a defect existed in Plaintiffs' original Complaint (Doc. No. 1) is moot because the FAC lists the citizenship of the members.  (See Doc. No. 67 ¶ 9–11.)

**B.  Personal Jurisdiction**

From the four groups of Defendants who filed Motions to Dismiss, three assert a lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2):  (1) Data Tech Defendants, which includes Data Tech, Michael Boothe, and David  Boothe;  (2) James Cunningham;  and (3) United Defendants, which includes United Electric and Eric Howlett.[16]  The Court will first address the issue of personal jurisdiction over Defendants on the RICO claims, and then address personal jurisdiction over Defendants on the state law claims.

**a.  RICO Claims (Counts IV and V)**

**i.  Relevant Law: Section 1965(b) and Minimum Contacts**

Personal jurisdiction refers to a court's power over parties to a lawsuit.  Plaintiffs assert several bases for the Court to exercise personal jurisdiction over out-of-state Defendants, none of whom are domiciled or incorporated in Pennsylvania. One basis is when a federal statute authorizes personal jurisdiction over a defendant for a federal cause of action.  See Laurel Gardens, LLC v. Mckenna, 948 F.3d 105, 113 (3d Cir. 2020) (citing Fed. R. Civ. P. 4(k)(1)(C)).

Here, personal jurisdiction is governed by a section of the RICO Act—18 U.S.C. § 1965(b)—which provides:

> In any <u>action under section 1964</u> of this chapter in any district court of the United States in which it is shown that the <u>ends of justice</u> require that <u>other parties residing in any other district</u> be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

---

[16]  Seven (7) Defendants have waived personal jurisdiction by either not answering the Amended Complaint, or by filing an Answer or a Motion to Dismiss without raising a personal jurisdiction challenge.  See Myers v. Am. Dental Ass'n, 695 F.2d 716, 721 (3d Cir. 1982) ("Unless the defendant objects on those grounds at the outset, he forfeits his right later to raise them as a defense.")  Defendants not raising a personal jurisdiction challenge are WG, SWS, and the JPC Defendants, which include JPC, Pacific Outdoor, Joseph Jacobs, Barry Caldwell, and Anthony Amado.

18 U.S.C. § 1965(b) (emphasis added).

Under Section 1965(b), to exercise personal jurisdiction over "other parties residing in any other district"—like out-of-state Defendants in this case—the "ends of justice" must require that the parties "be brought before the court."  18 U.S.C. § 1965(b).  And in Laurel Gardens, LLC v. Mckenna, 948 F.3d 105 (3d Cir. 2020), the Third Circuit noted that Section 1965(b) has three elements:  (1) the court has minimum contacts personal jurisdiction over at least one defendant in the case;  (2) exercising jurisdiction over the party serves the "ends of justice;"  and (3) personal jurisdiction comports with federal due process.  See id. at 120–22.

More specifically, the first element requires that at least one defendant in the case must satisfy the traditional minimum contacts test before a court can consider other defendants under the "ends of justice" test in Section 1965(b).[17]  See Laurel Gardens, 948 F.3d at 117–18, 120 ("The structure of § 1965 as well as the 'other parties' language of subsection (b) clearly require[s] the presence of at least one defendant that meets the traditional contacts test.")

The second element requires that exercising personal jurisdiction over a defendant serves the "ends of justice."  But when do the "ends of justice" require that a defendant be brought before a particular court?  On that question, the Third Circuit acknowledges a circuit split, but has not taken a side.  See Laurel Gardens, 948 F.3d at 121 (explaining the split between the Ninth and

---

[17]  The traditional minimum contacts test for personal jurisdiction, in turn, has three elements of its own.  A defendant must first "purposefully avail[] itself of the privilege of conducting activities within the forum State," ensuring that jurisdiction is not the result of 'random,' 'fortuitous,' or 'attenuated' contacts." Burger King Corp., 471 U.S. at 475.  Second, the Court must determine whether the litigation "arise[s] out of or relate[s] to" at least one of those contacts. Helicopteros, 466 U.S. at 414.  Third, if the first two requirements have been met, the court may consider whether exercising personal jurisdiction over the defendant "comport[s] with 'fair play and substantial justice.'" Burger King Corp., 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320).  The traditional minimum contacts test is another basis for personal jurisdiction that Plaintiffs rely on in this case.

Tenth Circuits).  The Ninth Circuit "ends of justice" test requires a plaintiff to "establish that there is no other district court that would have traditional personal jurisdiction over all of the defendants."  Butcher's Union Loc. No. 498 v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986).  On the other hand, the Tenth Circuit has rejected this requirement, stating that "ends of justice" was "not controlled by the facts that all defendants may be amendable to suit in one forum."  Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1232 (10th Cir. 2006).  The Tenth Circuit did not offer a brightline rule for comparison though, instead describing the "ends of justice" test as a "flexible concept uniquely tailored to the facts of each case."  Id.  However, the Tenth Circuit noted that the "ends of justice" are not satisfied merely because a plaintiff suffered damages in the forum state. See id.

For its part, the Third Circuit in Laurel Gardens did not pick a side because the plaintiffs established jurisdiction over defendants under both approaches.  Laurel Gardens, 948 F.3d at 121.  However, another factor that the Third Circuit considered was a defendant's proximity to the forum state "to avoid, where possible, haling defendants into far flung fora."  Laurel Gardens, 948 F.3d at 122 (quoting PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 72 (2d Cir. 1998)).

The third element under Section 1965(b) is that personal jurisdiction comports with federal due process.  On this requirement, the Third Circuit held that a court is "not limited to the defendant's contacts with the forum state and instead consider contacts with the nation as a whole." Laurel Gardens, 948 F.3d at 122.  Unlike the traditional requirement for fairness, which is concerned primarily with federalism, "this inquiry is . . . more focused on the national interest in furthering the policies of the federal statute at issue."  Id.

### ii.  Analysis: Personal Jurisdiction for RICO Claims

#### 1.  Data Tech Defendants (Data Tech, Michael Boothe, and David Boothe)

Data Tech Defendants argue that Plaintiffs have failed to properly allege two bases for personal jurisdiction under the RICO claims, including (1) whether the "ends of justice" test under Section 1965(b) requires bringing them before the Court, and (2) whether Data Tech Defendants had minimum contacts with Pennsylvania.  (Doc. No. 84 at 14–16.)  In their Response, Plaintiffs focus their analysis on the "ends of justice" inquiry, but still submit that Data Tech Defendants had "requisite minimum contacts with this forum."  (Doc. No. 94 at 13–17 & n.4.)  Because both tests are satisfied here, the Court has personal jurisdiction over the Data Tech Defendants.

The three-pronged analysis under Section 1965(b)—which requires (1) at least one other defendant in the case has traditional minimum contacts with the forum, (2) that the "ends of justice" are met by exercising jurisdiction, and (3) that jurisdiction comports with federal due process—permits the Court to find a basis for personal jurisdiction over Data Tech Defendants.

First, the Court has traditional personal jurisdiction over at least one other defendant in this case, the JPC Defendants.  JPC Defendants do not object to personal jurisdiction in their Motion to Dismiss (Doc. No. 82), recognizing that they have traditional minimum contacts with the forum, so at the very least the Court has personal jurisdiction over them because they waived their defense.  See Roche Diagnostics Corp. v. Smith, No. 2:17-cv-5552, 2022 WL 4596720, at *7 (D.N.J. Sept. 30, 2022) (citing Azubuko v. E. Bank, 160 F. App'x 143, 146 (3d Cir. 2005)) (noting that a court has traditional jurisdiction over a defendant who waives the defense).  Additionally, the JPC Defendants by their principals, Joseph Jacobs, Barry Caldwell, and Anthony Amado, had minimum contacts with Pennsylvania.  To determine whether JPC

Defendants had minimum contacts with Pennsylvania, the Court must assess whether JPC

Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities in

Pennsylvania[,] that [plaintiffs'] claims arise out of or relate to the defendant[s'] contacts with

the forum," and whether exercising personal jurisdiction would offend notions of fair play and

substantial justice. Hasson v. FullStory, Inc., 114 F.4th 181, 193 (3d Cir. 2024) (quoting Ford

Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021)).

- First, the JPC Defendants purposefully availed themselves of Pennsylvania through (1) an

  in-person visit to Philadelphia by Joseph Jacobs to encourage investment (Doc. No. 67 ¶

  136), (2) solicitation efforts through emails and texts to Pennsylvania (Id. ¶ 66, 68, 72,

  74–76, 78, 79, 85, 89, 90, 119, 136), and (3) financial exchanges from JPC and Pacific

  Outdoors to Plaintiffs, who were in Pennsylvania, over interstate wires (Id. ¶ 103–04).

  Because these events are not a result of "random," "fortuitous," or "attenuated" contacts,

  JPC Defendants purposefully availed themselves of the privileges of conducting activities

  in Pennsylvania. Burger King Corp., 471 U.S. at 475; see also Vizant Techs., LLC v.

  Whitchurch, 97 F. Supp. 3d 618, 630 (E.D. Pa. 2015) (finding traditional personal

  jurisdiction over civil RICO defendants who traveled to plaintiff's Pennsylvania office

  "on at least one occasion," and digitally communicated with individuals in Pennsylvania).

- Second, Plaintiffs' RICO claims "arise out of" or relate to JPC Defendants' contacts with

  the forum. Plaintiffs cite numerous texts, emails, and other interstate wires from

  resellers—including from JPC—that were directed at Pennsylvania and are central to

  both of Plaintiffs' RICO claims. (Doc. No. 67 ¶ 223–24, 244, 248); see also Lexington

  Ins. Co. v. Forrest, 354 F. Supp. 2d 549, 552 & n.2 (finding the "arise out of" prong was

  satisfied when plaintiff alleged predicate acts of wire fraud and "informational

communications [to a Pennsylvania resident] that are critical to the maintenance of the enterprise at the center of the RICO conspiracy.")

- Third, exercising personal jurisdiction over JPC Defendants—who all reside in neighboring New Jersey—would not offend notions of "fair play and substantial justice." As a result, traditional personal jurisdiction is proper over JPC Defendants for the RICO claims.

Because at least one Defendant has minimum contacts with Pennsylvania, the second element of Section 1965(b) then asks whether the "ends of justice" are met by exercising jurisdiction over Data Tech Defendants. Under both the Ninth and Tenth Circuits' "ends of justice" tests, Data Tech Defendants are properly before the Court. Under the Ninth Circuit test, there can be no other district that would have traditional personal jurisdiction over all the defendants. Butcher's Union, 788 F.2d at 539. In their Response, Plaintiffs assert that Pennsylvania is the only state where "all Defendants had contacts with Plaintiffs in Pennsylvania." (Doc. No. 94 at 15.) Though Plaintiffs overstate the lack of contacts with another forum, the Court ultimately finds Plaintiffs' argument persuasive. The only state that comes close to Pennsylvania is New Jersey, where (1) all JPC Defendants reside and (2) Plaintiffs met each Defendant in person.[18] (See Doc. No. 67 ¶ 63, 66, 67, 69, 82, 91, 111). However, Defendants James Cunningham, Eric Howlett, Dwayne Ratliff, and David Boothe each met Plaintiffs in New Jersey only one time (Id. ¶ 81, 91, 111), while the remainder of their alleged communications with Plaintiffs took place outside of that state. Without more contacts related to Plaintiffs' claims directed to New Jersey, traditional jurisdiction over these four

---

[18]   Like Pennsylvania, New Jersey has a long arm statute "permit[ting] the exercise of personal jurisdiction to the fullest extent possible under the Due Process Clause." GEICO Marine Ins. Co. v. Moskovitz, 670 F. Supp. 3d 168, 171 (D.N.J. 2023).

Defendants in that state would be improper.  See Langsam-Borenstein P'ship by Langsam v. NOC Enters., Inc., 137 F.R.D. 217, 220 (E.D. Pa. 1990) (holding one visit to forum was inadequate to establish minimum contacts).

Under the more flexible Tenth Circuit approach, the "ends of justice" are also met. Unlike the defendants in the Tenth Circuit's seminal Cory decision, whose only connection to the forum state was that the plaintiff-victim suffered damages there, Data Tech Defendants engaged in persistent inducements directed to Plaintiffs in Pennsylvania, as discussed supra.  See Cory, 468 F.3d at 1232.  Therefore, Plaintiffs have met their burden on the second prong of Section 1965(b) under both the Ninth and Tenth Circuit approaches.

Third, exercising jurisdiction over Data Tech Defendants comports with federal due process because of the strong national interest "in furthering the policies of the federal anti-racketeering statute enabling a single district court to exercise personal jurisdiction over all defendants."  Laurel Gardens, 948 F.3d at 123–24 (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 372 (3d Cir. 2002)) (cleaned up).  Moreover, this requirement is focused on contacts with the "nation as a whole," and Data Tech Defendants both reside and conduct business in the United States.  Accordingly, Data Tech Defendants are subject to personal jurisdiction under Section 1965(b)'s "ends of justice" test for their activities relating to the two RICO claims.

In addition to Section 1965(b) authorizing personal jurisdiction over Data Tech Defendants, the Court finds the traditional minimum contacts test provides another basis for personal jurisdiction.  First, Data Tech Defendants purposefully availed themselves of Pennsylvania for similar reasons as JPC Defendants did, including (1) three in-person visits by the Boothe principals to Pennsylvania;  (2) persistent communications by the Boothes to

33

Plaintiffs through emails, texts, and calls while Plaintiffs were in Pennsylvania;  and (3)

payments and invoices sent by Data Tech to Plaintiffs while Plaintiffs were in Pennsylvania.

The allegations in the FAC include:

- Data Tech Defendant's in-persons visits to Pennsylvania included a dinner in downtown

  Philadelphia in December 2023 when Michael Boothe solicited Plaintiffs to invest in

  Boxes (Doc. No. 67 ¶ 111), David Boothe's January 2024 visit to Philadelphia when he

  arranged meetings with "Plaintiffs and other Pennsylvania residents" and attended a

  Philadelphia 76ers game with a respected mentor of Plaintiffs (Id. ¶ 117), and Michael

  Boothe's January 2024 visit to Philadelphia when he "solicited Plaintiffs to meet for

  drinks at a bar near Philadelphia International Airport."  (Id. ¶ 118).

- Michael Boothe and David Boothe consistently solicited Plaintiffs in 2023 and 2024

  through emails, texts, and calls while Plaintiffs were in Pennsylvania.  (See id. ¶ 88, 94,

  95, 97, 108, 112, 122, 133.)

- While Plaintiffs were in Pennsylvania, Data Tech paid Plaintiffs over interstate wires

  from purported "revenue" generated by Plaintiffs' Boxes (Id. ¶ 88), received payment

  from Plaintiffs over interstate wires for Box purchases (Id. ¶ 115 n.4), and sent invoices

  to Plaintiffs (Id. ¶ 120, 130, 136).[19]

As demonstrated by Michael and David Boothe's in-person visits to Philadelphia to court

Plaintiffs as investors, Data Tech Defendants would have understood that their virtual

---

[19]  At times in their FAC, Plaintiffs assert that "Data Tech" was the only party who sent or
received payments and invoices, and do not distinguish between the actions of Michael and
David Boothe, Data Tech's principals.  However, given that Michael and David Boothe were
the only principals at Data Tech (Doc. No. 67 ¶ 26–27), the Court is satisfied at this stage that
the proper inference is that both Michael and David Boothe were involved in the payment
and invoice process with Plaintiffs.

communications, invoices, and payments were directed at residents in Pennsylvania. Because these events are not a result of "random," "fortuitous," or "attenuated" contacts, Data Tech Defendants purposefully availed themselves of Pennsylvania. Burger King Corp., 471 U.S. at 475; see also Vizant, 97 F. Supp. 3d at 630 (in-person travel to the forum "on at least one occasion," along with consistent virtual communications directed to people in Pennsylvania, were sufficient for minimum contacts).

Similarly, Plaintiffs' RICO claims "arise out of" or relate to Data Tech Defendant's contacts with the forum. In their FAC, and as recounted above, Plaintiffs cite numerous texts, emails, and other interstate wires from resellers—including from Data Tech—that were directed at Pennsylvania and are central to both of Plaintiffs' RICO claims. (Doc. No. 67 ¶ 223–24, 244, 248); see also Lexington, F. Supp. 2d at 552 & n.2 (finding the "arise out of" prong was satisfied when plaintiff alleged predicate acts of wire fraud and "informational communications [to a Pennsylvania resident] that are critical to the maintenance of the enterprise at the center of the RICO conspiracy."). Finally, because the Court cannot discern—nor do the parties provide— reasons why exercising personal jurisdiction would offend notions of "fair play and substantial justice," personal jurisdiction is proper over Data Tech on the RICO claims. As a result, in addition to having personal jurisdiction over Data Tech Defendants under the "ends of justice test," they also have minimum contacts with Pennsylvania under the traditional test.

### 2. James Cunningham

James Cunningham argues generally that the FAC fails to satisfy the traditional contacts test or the "ends of justice" test. (Doc. No. 81 at 12–14.) In their Response, Plaintiffs focus on Section 1965(b)'s authorization for personal jurisdiction over Cunningham rather than on the minimum contacts test, arguing that Cunningham satisfies both the Ninth and Tenth Circuit's

approach to "ends of justice".[20]  Therefore, the Court will only analyze whether jurisdiction is proper under Section 1965(b), which requires (1) traditional personal jurisdiction over at least one other defendant, (2) that exercising jurisdiction meets the "ends of justice," and (3) that jurisdiction comports with federal due process.

For the first requirement, as discussed supra, traditional jurisdiction has been established over several Defendants, including Data Tech Defendants and JPC Defendants.  Second, because no other district would have traditional personal jurisdiction over all Defendants in this case, the Ninth Circuit's "ends of justice" rule is satisfied.  But the Tenth Circuit's lack of brightline rules in its "ends of justice" test does not clarify much in James Cunningham's case.  However, Cunningham's connections to Pennsylvania, while not as strong as Data Tech Defendant's connections, are not solely based on Plaintiff suffering harm there.  See Cory, 468 F.3d at 1232; (See Doc. No. 67 ¶ 150.)  The Third Circuit in Laurel Gardens also included a defendant's proximity to the forum state as relevant to the "ends of justice" inquiry.  Laurel Gardens, 948 F.3d at 122.  In this regard, Cunningham resides in Virginia, so jurisdiction over him in Pennsylvania would not risk "haling [a] defendant[] into far flung fora."  Id.  Moreover, allowing one core member of the RICO enterprise to avoid suit would not serve the "ends of justice."

---

[20]  Plaintiffs only make passing reference to the traditional minimum contacts test in their Response.  (See Doc. No. 92 at n.5.)  Plaintiffs do not argue that Cunningham's single visit to New Jersey or his single Zoom call with Plaintiffs while Plaintiffs were in Pennsylvania establish minimum contacts with the state for their RICO claims.  Nor could they.  As Cunningham convincingly argues, this Zoom call with Plaintiffs was the sole contact with the state, and was held without knowledge of "where the Plaintiffs were from or did business." (Doc. No. 81 at 13.)  Unlike the digital communications to Plaintiffs from Data Tech Defendants and JPC Defendants—who visited Pennsylvania and sold Plaintiffs Boxes in the state—Cunningham had no reason to believe his single virtual communication was directed toward Pennsylvania.  Therefore, Cunningham did not purposefully avail himself of the privilege of conducting activities in Pennsylvania, so the Court cannot use the minimum contacts test as a basis for jurisdiction over him.

Plaintiffs demonstrate Cunningham's centrality to the WG Ponzi scheme by attaching a letter from CEO Cunningham touting his involvement with the Pattern of Life Program since its inception due to his prior roles at the company.  (Doc. No. 67 Ex. F.)

The third requirement, which requires jurisdiction to comport with federal due process, is easily satisfied.  James Cunningham both resides and conducts business in the United States, so he has contacts "with the nation as a whole."  See Laurel Gardens, 948 F.3d at 122.  And as discussed supra, the policies of RICO are furthered when a district court can exercise jurisdiction over all defendants.  Id. at 122–23.  Consequently, James Cunningham is subject to personal jurisdiction on both RICO counts under Section 1965(b).

### 3.  United Defendants (Eric Howlett and United Electric)

United Defendants do not contest personal jurisdiction over them on the RICO claims. They only assert that Plaintiffs have failed to state a claim under Rule 12(b)(6) on both counts.[21] Therefore, United Defendants have conceded the matter of personal jurisdiction.

But there also is a second basis here for personal jurisdiction over United Defendants on the RICO claims: Section 1965(b), discussed above, authorizes personal jurisdiction.  As described supra, the first prong of the Section 1965(b) test from Laurel Gardens is satisfied because the Court has traditional jurisdiction over at least one defendant, including the JPC and Data Tech Defendants.  Regarding the second prong—whether the "ends of justice" are met by exercising jurisdiction—the Ninth Circuit test is satisfied because no other district would have traditional jurisdiction over all Defendants.  Although less obvious, United Defendants also clear

---

[21]    Instead, United Defendants only assert a lack of personal jurisdiction on the state law claims.  (Doc. No. 79 at 10) ("[O]nce the RICO and RICO conspiracy claims are dismissed, the state-law claims should also be dismissed pursuant to Rule 12(b)(2), for failure to establish a prima facie case of personal jurisdiction.")

the Tenth Circuit's "ends of justice" hurdle because (1) their connection with Pennsylvania was not solely based on Plaintiffs suffering damages there (Doc. No. 67 ¶ 97), and (2) United Defendants are alleged to be key contributors to the WG Ponzi scheme because they were "responsible for all Pattern of Life installations." (Id. ¶ 81, 97.) Finally, the third prong is satisfied because United and Eric Howlett—both based in the United States—have sufficient contacts with the nation as whole, such that jurisdiction would comport with federal due process. Accordingly, Section 1965(b) authorizes personal jurisdiction over United Defendants on the two RICO claims.

### b.  State Law Claims (Counts I, II, III, VI, VII, VIII, IX)

Plaintiffs also assert seven state law claims against Moving Defendants. (See Doc. No. 67 ¶ 173–293.) Against Data Tech Defendants, Plaintiffs assert the following claims: (1) fraudulent misrepresentation and concealment (Count II), (2) negligent misrepresentation (Count III), (3) breach of contract (Count VII), (4) aiding and abetting fraud (Count VIII), and (5) civil conspiracy (Count IX).

Against Defendant James Cunningham, Plaintiffs assert the following claims: (1–2) fraudulent misrepresentation and concealment (Counts I, II), (3) negligent misrepresentation (Count III), (4) aiding and abetting fraud (Count VIII), and (5) civil conspiracy (Count IX).

Against United Defendants, Plaintiffs assert the following claims: (1) fraudulent misrepresentation and concealment (Count II), (2) negligent misrepresentation (Count III), (3) aiding and abetting fraud (Count VIII), and (4) civil conspiracy (Count IX).

As noted supra, even if a court has personal jurisdiction over a party for a federal claim, that fact alone does not guarantee personal jurisdiction over the party for state law claims in the same case. See Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 95 n.1 (3d Cir. 2004) ("[I]n

general, a court must analyze questions of personal jurisdiction on a defendant-specific and claim-specific basis.")

Thus, as applied here, Section 1965(b)'s authorization of personal jurisdiction over Defendants on the RICO claims does not, on its own, confer jurisdiction over those Defendants for Plaintiffs' remaining state law claims. Additionally, if a defendant does not have minimum contacts with the forum state, then another basis for personal jurisdiction over the defendant on the state law claims is required. Plaintiffs submit that this other basis for personal jurisdiction over state claims comes from "pendent personal jurisdiction." (Doc. No. 67 ¶ 37.)

### i.  Relevant Law: Pendent Personal Jurisdiction

The doctrine of pendent personal jurisdiction may, in some cases, permit a court to exercise jurisdiction over a defendant for state claims that are related to federal claims in the case. The Third Circuit in Laurel Gardens discussed pendent personal jurisdiction in a RICO case with related state claims. See 948 F.3d at 123–24. There, the court quoted the following passage from Robinson v. Penn Central Co., 484 F.2d 553 (3d Cir. 1973), in which the Third Circuit first recognized the doctrine of pendent personal jurisdiction in a related context:

> Analysis should begin, we think, with the fact that in the Securities Act of 1933 and the Securities Exchange Act of 1934 Congress has bestowed upon the United States District Courts the power to extend their writ extraterritorially so as to compel a personal appearance before them. Once the defendant is before the court, it matters little, from the point of view of procedural due process, that he has become subject to the court's ultimate judgment as a result of territorial or extraterritorial process. Looked at from this standpoint, the issue is not one of territorial in personam jurisdiction—that has already been answered by the statutes—but of subject matter jurisdiction. It is merely an aspect of the basic pendent jurisdiction problem. In United Mine Workers v. Gibbs, [383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)], the Supreme Court recognized that a discretionary approach should be taken in considering whether to entertain pendent claims. Justification for entertaining such claims "... lies in considerations of judicial economy, convenience, and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims ...." [383 U.S. at 726, 86 S.Ct. 1130]. Moreover, while the issue of power to entertain a suit

39

> for an in personam judgment on a pendent state law claim will ordinarily be resolved on the pleadings, the court remains free throughout the proceedings to dismiss such a claim if that seems the fairer course. [Id. at 727, 86 S.Ct. 1130.] In this case, recognizing that Cabot was properly before it by virtue of extraterritorial service authorized by two federal statutes, the district court properly weighed considerations of judicial economy, convenience and fairness, and concluded that it would entertain the pendent claims. That course was within its power and the district court will also have power to dismiss the pendent claims in the future as noted above.

Laurel Gardens, 948 F.3d 105, 123–24 (quoting Robinson, 484 F.2d at 555–56).

In Laurel Gardens, plaintiffs brought Pennsylvania claims for, inter alia, civil conspiracy, fraud, and negligent misrepresentation that were related to underlying RICO claims. Id. at 109. The Court in Laurel Gardens held that when (1) Section 1965(b) authorizes jurisdiction over an out-of-state defendant on a RICO claim, and (2) a plaintiff's state claims "are so related to the claims under RICO," such that factors like judicial economy, convenience, and fairness to the litigants weigh in favor of hearing the federal and state claims together, a district court may exercise subject matter jurisdiction over the state claims. See id. at 123–24 (citing 28 U.S.C. § 1367(a); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). However, as the Third Circuit noted, pendent personal jurisdiction over state claims—which is another way of couching subject matter jurisdiction—is appropriate to the extent that the "anchor" federal claim remains in the case. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 383 (3d Cir. 2010). Accordingly, if the Court dismisses the RICO claims against a defendant on a Rule 12(b)(6) motion, then it must decline to exercise pendent jurisdiction over the related state claims if it has no other basis for jurisdiction over them. Laurel Gardens, 948 F.3d at 124 (quoting 28 U.S.C, § 1367(c)(3)) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

40

**ii. Analysis: Personal Jurisdiction for State Law Claims**

Only three groups of Moving Defendants challenge personal jurisdiction in this case: (1) Data Tech Defendants, (2) James Cunningham, and (3) United Defendants. As noted <u>supra</u>, the doctrine of pendant personal jurisdiction applies to all Moving Defendants because a federal statute, Section 1965(b), authorizes jurisdiction over them for Plaintiffs' RICO claims. Therefore, if Plaintiffs' state claims arise from a common nucleus of facts as their RICO claims, such that factors of judicial economy, convenience, and fairness to the litigants weigh in favor of hearing the federal and state claims together, the Court may exercise jurisdiction over Data Tech Defendants, James Cunningham, and United Defendants on the state claims in this case. <u>See</u> <u>Laurel Gardens</u>, 948 F.3d at 123–24.

- First, the fraudulent and negligent misrepresentation claims alleged in Counts I to III are sourced from the same nucleus of facts as Plaintiffs' RICO claims. The FAC demonstrates their factual similarity, as both are predicated on misleading statements and actions to maintain the WG Ponzi scheme. <u>Compare</u> (Doc. No. 67 ¶ 179–80, 196–97, 210) (misrepresentation claims), <u>with</u> <u>id.</u> ¶ 223–24, 244, 248 (RICO claims). In their RICO claim, Plaintiffs allege a sprawling enterprise maintained by in-person visits, texts, emails, and interstate wire payments. During these interactions, Plaintiffs aver that Data Tech, JPC, United, Dwayne Ratliff, and James Cunningham mispresented the viability of WG's business model to induce them to purchase Boxes, especially by misleading them about WG and Intel's relationship (<u>Id.</u> ¶ 63, 75, 90, 92), inflating the demand for Boxes (<u>Id.</u> ¶ 93, 113, 133), and distorting the "revenue" received from Boxes (<u>Id.</u> ¶ 72, 79, 88, 98). Those same statements and actions—whether accomplished through fraud or negligence—constitute the foundation of Plaintiffs' misrepresentation claims.

41

- Similarly, Plaintiffs' aiding and abetting fraud (Count VIII) and civil conspiracy (Count IX) claims are factually indistinguishable from Plaintiffs' RICO claims, especially the RICO conspiracy claim.  (See id. ¶ 246.)  Notably, Defendants coordinated with each other by jointly reselling WG's Boxes, inducing Plaintiffs to invest more capital (Id. ¶ 132), monitoring all Box sales and deliveries across the country (Id. ¶ 96), delivering Boxes purchased from other resellers (Id. ¶ 102), sending Plaintiffs information on revenue "generated" from Boxes purchased by other resellers (Id. ¶ 103), and directing installation payments to United and Eric Howlett (Id. ¶ 125).

- The same result is warranted on Plaintiffs' breach of contract claims against JPC (Count VI) and Data Tech (Count VII).  First, both JPC and Data Tech entered into verbal contracts with Plaintiffs to purchase Boxes, which were the culmination of months of negotiations and solicitations that form, in part, the foundation of Plaintiffs' RICO claims. (Id. ¶ 272.)  Second, Plaintiffs allege that Boxes purchased from Data Tech and JPC were delayed or never delivered (Id. ¶ 264–65, 276), and the failure to truthfully explain why those Boxes were delayed or never delivered is part of Plaintiffs' RICO claims.  (See id. ¶ 225, 248).

Thus, because Plaintiffs' state law claims stem from the same nucleus of facts as their RICO claims, the Court will exercise pendent personal jurisdiction over Data Tech Defendants, James Cunningham, and United Defendants on those state claims.  See Roche, 2022 WL 4596720, at *7 (exercising pendent personal jurisdiction in a RICO case over related state law claims, which included common law fraud, aiding and abetting fraud, conspiracy, and negligent misrepresentation).

One final note—judicial economy would be best served by considering "all legal theories arising from a single set of operative facts." See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997) (internal citation omitted). The "minimal burden" on a party to defend related state law claims, especially by a defendant already properly before a court, is not unfair to him. Id. (finding district court's exercise of pendent personal jurisdiction over a breach of contract claim proper in a RICO case); see also AlliedSignal Inc. v. Blue Cross of California, 924 F. Supp. 34 (D.N.J. 1996) (holding the same in a case involving ERISA, another federal statute authorizing nationwide service of process). Accordingly, pendant personal jurisdiction is proper over Data Tech Defendants,[22] James Cunningham, and United Defendants on all state law claims. In sum, Plaintiffs have adequately alleged that the Court has personal jurisdiction against all Moving Defendants on the state law claims.

## C. RICO Claims (Counts IV and V)

Beyond personal jurisdiction, all Moving Defendants move to dismiss the FAC for failure to state RICO claims under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs bring RICO claims against all Defendants under two provisions of the RICO Act: (1) 18 U.S.C. § 1962(c) and (2) 18 U.S.C. § 1962(d). (Doc. No. 67 at 52–63.) Subsection (c) essentially restricts persons "employed by or associated with" an enterprise to engage in racketeering activity. Reves v. Ernst & Young, 507 U.S. 170, 185 (1993). Subsection (d) prohibits a conspiracy to violate subsection (c). The Court will first explain the different elements of each claim, and then will address arguments advanced by Moving Defendants.

---

[22]  Given that Plaintiffs' state law claims against Data Tech Defendants cover the same activities by them in Pennsylvania which the Court has already found sufficient under the minimum contacts test on the RICO claims, it is likely that the Court has traditional—not just pendent—jurisdiction over Data Tech Defendants. But because pendent jurisdiction is easily established here for the state claims, the Court need not further analyze minimum contacts.

### a. Rico Claim #1: 18 U.S.C. § 1962(c) ("Section 1962(c)")

The congressional purpose in enacting RICO was "the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91–617, at 76 (1969). The provisions of RICO encompass complex crimes involving multiple elements. Although RICO is a criminal offense, the statute also provides civil remedies to a plaintiff injured by RICO activity. 18 U.S.C. § 1964(c).

### i. Relevant Law: Section 1962(c)

18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.[23]

To assert a Section 1962(c) claim, a plaintiff must allege that a person employed by or associated with an enterprise (1) conducted or participated (2) in the affairs of an enterprise (3) through a pattern (4) of racketeering activity. Schwartz v. Laws. Title Ins. Co., 680 F. Supp. 2d 690, 703 (E.D. Pa. 2010) (citation omitted); Gratz v. Ruggerio, 822 F. App'x 78, 80–81 (3d Cir. 2020) (citation omitted). "Person" is defined in the RICO statute as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

### 1. "Conduct or Participate"

A plaintiff must establish that a defendant participated or conducted the enterprise's affairs. The United States Supreme Court has said "[a]s a verb, 'conduct' means to lead, run, manage, or direct." Reves, 507 U.S. at 177 (citing Webster's Third New International Dictionary 474 (1976)). Regarding the definition of "participate," the Court has noted:

---

[23] The provision for "collection of unlawful debt" does not apply here.

44

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

Id. at 179.  "[O]ne is not liable under [Section 1962(c)] unless one has participated in the operation or management of the enterprise itself."  Id. at 183.  Section 1962(c) "cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs."  Id. at 185 (emphasis in original).

### 2.  "Enterprise"

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise may be pled by showing: "(i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity."  Schwartz, 680 F. Supp. 2d at 706 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)).  Further, it "must have at least three structural features: [i] a purpose, [ii] relationships among those associated with the enterprise, and [iii] longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009).

### 3.  "Pattern of Racketeering Activity"

Section 1961 provides an extensive list of racketeering activities, which include mail and wire fraud.  18 U.S.C. § 1961(1).  If a plaintiff alleges racketeering activity rooted in fraud, he or she must meet the standard set forth in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which

45

states: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, Rule 9(b) requires a plaintiff to "describe the circumstances of the alleged fraud with precise allegations of date, time, or place or otherwise use some means of injecting precision and some measure of substantiation into their allegations of fraud." Ketner v. Widell, No. 5:20-cv-6360, 2021 WL 2808829, at *8 (E.D. Pa. July 6, 2021) (internal quotation marks and citation omitted).

A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "It is the 'person' charged with the racketeering offense—not the entire enterprise—who must engage in the 'pattern of racketeering activity.'" United States v. Bergrin, 650 F.3d 257, 267 (3d Cir. 2011) (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 244 (1989)). Importantly, it is not enough to plead a mere pattern of racketeering activity; instead, one must show two additional elements: (1) relatedness and (2) continuity. See Bergrin, 650 F.3d at 267 (3d Cir. 2011).

Relatedness is defined as follows: "the criminal activities 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. (citation omitted). Continuity may be characterized as closed-ended or open-ended. See id. (citation omitted). Closed-ended continuity is "a closed period of repeated conduct . . . [that] can be established 'by proving a series of related predicates extending over a substantial period of time.'" Germinaro v. Fid. Nat'l Title Ins. Co., 737 F. App'x 96, 102 (3d Cir. 2018). The meaning of "substantial" has not been clearly defined, but a pattern of activity alleged to have lasted more than three years has been

held to be substantial. See Tabas v. Tabas, 47 F.3d 1280, 1294 (3d Cir. 1995) (citations omitted); Liberty Bell Bank v. Rogers, 726 F. App'x 147, 155 (3d Cir. 2018) ("[H]e engaged in an overall scheme that extended from at least 2010 to 2013, a period of time sufficient to satisfy the continuity requirement of RICO."). Open-ended continuity, by contrast, consists of "past conduct that by its nature projects into the future with a threat of repetition." Bergrin, 650 F.3d at 267. The threat of repetition "exists when the predicate acts are a part of defendant's 'regular way of doing business' ... [or the] defendant operates a 'long-term association that exists for criminal purposes.'" Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609–10 (3d Cir. 1991) (citation omitted).

### ii. Analysis: Section 1962(c)

All four groups of Defendants have moved to dismiss Count IV of the FAC, which alleges the substantive RICO claim under Section 1962(c). In doing so, they assert the following reasons for dismissal.

- In United Defendants' Motion to Dismiss,[24] they contend that Plaintiffs fail to (1) sufficiently plead mail and wire fraud as RICO predicate acts (Doc. No. 22 at 15–22; Doc. No. 79 at 9–10), (2) demonstrate how United Defendants conducted or participated in the RICO enterprise (Doc. No. 22 at 23–25; Doc. No. 79 at 7–9), and (3) allege an association-in-fact enterprise (Doc. No. 22 at 26–27).

- In James Cunningham's Motion to Dismiss, he contends that Plaintiffs fail to sufficiently plead (1) an association-in-fact enterprise by not distinguishing between the racketeering

---

[24]   United Defendants' Motion to Dismiss the FAC (Doc. No. 79) incorporates their arguments made in their original Motion to Dismiss the Complaint. (Doc. No. 22). This Motion (Doc. No. 22) was denied without prejudice as moot after the FAC was filed. (Doc. No. 69.)

activity and the enterprise, and by not alleging a continuing unit (Doc. No. 81 at 15–19),
and (2) a pattern of racketeering activity (Id. at 19–25).

- In JPC Defendants' Motion to Dismiss, they contend that Plaintiffs fail to sufficiently
  plead (1) the adequate continuity necessary for a pattern of racketeering activity (Doc.
  No. 82 at 15–17), and (2) an association-in-fact enterprise (Id. at 17–18).

- In Data Tech Defendants' Motion to Dismiss, they contend that Plaintiffs fail to
  sufficiently plead (1) mail or wire fraud as RICO predicate acts (Doc. No. 84 at 17–19),
  (2) a pattern of racketeering activity (Id. at 19-22), and (3) an association-in-fact
  enterprise (Id. at 23– 26).

As stated above, to assert a Section 1962(c) claim, a plaintiff must allege that a defendant
employed by or associated with an enterprise conducted or participated in an enterprise's affairs
through a pattern of racketeering activity.  Schwartz, 680 F. Supp. 2d at 703 (citation omitted).
Because Moving Defendants' contentions often overlap by asserting the same alleged
deficiencies, each alleged deficiency will be discussed in the following order:  the enterprise
prong, the "conduct or participate" prong, and the pattern of racketeering prong.

### 1. Association-in-Fact Enterprise

Moving Defendants submit that Plaintiffs fails to state a RICO claim because Plaintiffs
did not plead a valid association-in-fact enterprise.  An association-in-fact enterprise may be pled
by showing: "(i) that there exists an ongoing organization, formal or informal; (ii) that the
various associates of the organization function as a continuing unit; and (iii) that the organization
has an existence separate and apart from the alleged pattern of racketeering activity."  Schwartz,
680 F. Supp. 2d at 706 (citing United States v. Turkette, 452 U.S. 576, 583 (1981)).  Moving
Defendants assert three deficiencies with the allegations in the FAC on the enterprise prong:  (1)

48

there is no distinction between the "person" and "the enterprise;" (2) the enterprise does not have

an existence separate from the pattern of racketeering activity;  and (3) the various associates of

the organization do not function as a "continuing unit" who coordinate activities with each other.

As a threshold matter, the FAC identifies the enterprise as follows:

> Together, Wireless Guardian, SWS, Dumas, Ratliff, Cunningham, C&M Consultants, JPC, Pacific Outdoor, Jacobs, Caldwell, Amado, Data Tech, MDJN, United, Dave Boothe, Mike Boothe, and Howlett constituted and operated an association-in-fact enterprise (the "Enterprise") under 18 U.S.C. § 1961(4) through their operation of the Wireless Guardian Ponzi scheme.

(Doc. No. 67 ¶ 217.)  Plaintiffs also attach the following graphic to demonstrate the

structure of the enterprise.



(Doc. No. 91 at 14.)

### a.  The "Persons" Are Not the Same as the "Enterprise"

First, United Defendants contend that the "person[s]" who violate RICO cannot be the

same as the enterprise" and that this precept was violated here.  (Doc. No. 22 at 26–27.)  "[T]o

49

establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). In pleading a violation of Section 1962(c), "a corporation may be both a defendant 'person' and part of an association-in-fact enterprise." Coleman v. Commonwealth Land Title Ins. Co., 684 F. Supp. 2d 595, 609 (E.D. Pa. 2010) (internal citation omitted). And "[i]t is well-settled that an 'association-in-fact' enterprise may consist of a corporation together with non-employee individuals." Id. (citing R.R. Brittingham v. Mobil Corp., 943 F.2d 297, 302 (3d Cir. 1991)). Furthermore, an enterprise "may be comprised only of defendants, or of defendants and non-defendants." United States v. Urban, 404 F.3d 754, 782 (3d Cir. 2005).

> Again, it bears repeating that the "enterprise" is described in the FAC as follows:
>
> Together, Wireless Guardian, SWS, Dumas, Ratliff, Cunningham, C&M Consultants, JPC, Pacific Outdoor, Jacobs, Caldwell, Amado, Data Tech, MDJN, United, David Boothe, Michael Boothe, and Howlett constituted and operated an association-in-fact enterprise (the "Enterprise") under 18 U.S.C. § 1961(4) through their operation of the Wireless Guardian Ponzi scheme.

(Doc. No. 67 ¶ 217.)

United Defendants argue that "Plaintiffs allege that all sixteen defendants are the association-in-fact enterprise," and for this reason, contend that the "distinctiveness" requirement of RICO is violated.[25] (Doc. No. 22 at 26.) At the outset, though, the FAC only names fourteen defendants. Additionally, in this case, Plaintiffs have named three non-Defendants as members of the enterprise, (1) Jason Dumas, co-founder of WG who has since disappeared, (2) C&M

---

[25]    United Defendants' Motion to Dismiss the FAC (Doc. No. 79) incorporates all arguments from their Motion to Dismiss the original Complaint (Doc. No. 22). The original Complaint named sixteen defendants, which included every individual and entity from the above list in the FAC (Doc. No. 67 ¶ 217) except for C&M Consultants. The FAC only names fourteen Defendants.

50

Consulting ("C&M"), and (3) MDJN.  (Doc. No. 67 ¶ 217.)  The FAC describes C&M and

MDJN in the below passages:

> 51. Defendant Cunningham siphoned off over $2.4 million of Ponzi scheme
> profits from Wireless Guardian to his related entity, Cunningham and McGinley
> Consultants LLC ("C&M Consultants"), a Virginia limited liability company,
> wholly owned and operated by Cunningham and his wife.
>
> ***
>
> 59. Throughout the course of the Defendants' Ponzi scheme, Defendants siphoned
> money from Wireless Guardian into their personal bank accounts and their related
> business accounts such as SWS, C&M Consultants, United, Pacific Outdoor, and
> MDJN, in an effort to shield Defendants' ill-gotten gains from suits like this.
>
> ***
>
> 113.  . . . On this Miami trip in January 2024, Defendant Michael Boothe
> introduced Plaintiffs to Joseph MacLellan, who was described as a principal of
> MDJN Global Communications ("MDJN") and the personal attorney for the
> Boothes and Data Tech. It was represented to Plaintiffs that MDJN was the
> "investment arm" of Defendant Data Tech.

(Doc. No. 67 ¶ 51, 59, 113.)  Because Plaintiffs allege that the enterprise includes three non-

Defendants, including two entities critical to the enterprise and the RICO violations, C&M and

MDJN, which were used to siphon proceeds illegally obtained, and an individual, Dumas, who

co-founded WG and was the Chairman of WG's Board, United Defendants' argument that the

enterprise is the same as its members is unavailing.

### b.  The Enterprise Has an Existence Separate from the Racketeering Activity

Moving Defendants' second contention on the "enterprise" prong is that Plaintiffs do not

allege "that the organization has an existence separate and apart from the alleged pattern of

racketeering activity."  Schwartz, 680 F. Supp. 2d at 706 (citing Turkette, 452 U.S. at 583).  The

United States Supreme Court in Boyle described this requirement as follows:

51

This [element] may be interpreted in at least two different ways, and its correctness depends on the particular sense in which the phrase is used. If the phrase is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct. As we explained in Turkette, the existence of an enterprise is an element distinct from the pattern of racketeering activity and "proof of one does not necessarily establish the other." 452 U.S., at 583, 101 S.Ct. 2524.

On the other hand, if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect. We recognized in Turkette that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce." Ibid.

Two groups of Moving Defendants, including Data Tech Defendants and James Cunningham, advance this argument. The essence of their contention is that Plaintiffs have not shown that the enterprise exists outside of its racketeering activity, which, in this case, is mail and wire fraud. (Doc. No. 81 at 16–19; Doc. No. 84 at 24–26.) For support, Data Tech Defendants and James Cunningham point to Plaintiffs' claim that the enterprise's only "purpose" was to fraudulently induce End Users like Plaintiffs to invest in Boxes and locations, which is indistinguishable from the fraud-based racketeering activity. (See Doc. No. 84 at 24) (citing Doc. No. 67 ¶ 219.); (see also Doc. No. 81 at 16–17) (citing Doc. No. 68 at 5–6.) In their response, Plaintiffs assert that an enterprise's sole purpose may have been to carry out the alleged racketeering activity, so alleging additional lawful activities is not necessary. (Doc. No. 94 at 19–20; Doc. No. 92 at 20.)

Notably, Data Tech Defendants and James Cunningham conflate an enterprise's "purpose" with its "racketeering activity." Turkette's requirement that the enterprise be "separate and apart from the pattern of activity in which it engages" does not mean that an enterprise cannot have, as its purpose, the facilitation of a particular type of racketeering. See Boyle, 556 U.S. at 942, 951 (finding no issue with trial court's jury instruction that an enterprise could be

52

"form[ed] solely for the purpose of carrying out a pattern of racketeering acts.")  And, as explained in the Boyle passage quoted above, evidence proving an enterprise and racketeering activities will often overlap, and the shared evidence may be enough to infer an association-in-fact enterprise.  Id. at 947.  Thus, the mere fact that Plaintiffs' evidence of predicate acts also clarifies and provides parameters to the alleged enterprise is not fatal here.  Moreover, the Third Circuit has held "it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses." United States v. Console, 13 F.3d 641, 651–52 (3d Cir. 1993) (quoting United States v. Riccobene, 709 F.2d 214, 222 (3d Cir. 1983)).[26]

Here, Plaintiffs clear this relatively low bar set by Console.  Plaintiffs allege in their FAC that WG's enterprise consists of certain non-Defendants who performed activities outside of racketeering, including C&M Consultants and Data Tech's related entity, MDJN Global Communications ("MDJN").  (Doc. No. 67 ¶ 59, 113.)  Plaintiffs allege that MDJN was Data Tech's "investment arm," which—in addition to siphoning money as part of the scheme—also invested Data Tech's funds.  (Id.)  Additionally, United and Eric Howlett's routine installation of Boxes purchased by End Users was another function demonstrating the enterprise's existence beyond what was necessary to commit predicate racketeering offenses.  Put differently, the predicate acts of mail and wire fraud had already been consummated by the time United installed

---

[26]    One way to prove separateness is by alleging that an enterprise conducted legitimate activities alongside racketeering activities.  Console, 13 F.3d at 652 ("This requirement is satisfied by the evidence that both the firm and the [enterprise] coordinated the commission of multiple predicate offenses . . .  and continued to provide legitimate services during the period in which they were engaged in racketeering activities.")  But Plaintiffs' RICO Case Statement states "the Enterprise did not participate in lawful activity."  (Doc. No. 68 at 5.)

Boxes for End Users like Plaintiffs, but their acts of "installation" of allegedly useless Boxes contributed to the continuation of the scheme.[27]  Moreover, numerous facts are alleged on how each Defendant contributed to the WG Ponzi scheme to carry out its purpose—the defrauding of investors and the reaping of financial rewards for themselves.  As a result, at this early stage in the case, Plaintiffs' allegations raise a reasonable inference that the enterprise and its predicate racketeering acts had a separate existence.

Cases relied on by Data Tech Defendants and James Cunningham are unavailing to their claim that the enterprise is not separate from its pattern of racketeering activity.  In Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., Inc., the court found that the separate existence requirement was adequately alleged because defendants did "more than carry on the normal affairs of actors in the legal credit market."  374 F. Supp. 3d 361, 374 (E.D. Pa. 2019).  Here, WG's enterprise did more than sell products in the normal course of affairs.  Rather, as the FAC alleges, several individual and corporate Defendants devised a scheme to fraudulently induce End Users to invest in products and then siphoned those investments for their personal enrichment.  James Cunningham also cites another case for the proposition that an enterprise's sole purpose cannot be to perpetrate fraud.  See Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 401 (S.D.N.Y. 2000).  However, Goldfine was decided before Boyle clarified the more lenient evidentiary requirement to prove an association-in-fact enterprise, and other courts have refused to follow its strict approach to the separateness requirement.  See World Wrestling Ent., Inc. v. Jakks Pac., Inc., 425 F. Supp. 2d 484, 497–500 (S.D.N.Y. 2006), aff'd, 328 F. App'x 695 (2d Cir.

---

[27]  As described in more detail infra, United's installation services provided a veneer of legitimacy to the WG Ponzi scheme, and for this reason was important to maintaining the enterprise.  Nevertheless, United's installations were not—in and of themselves—predicate racketeering offenses.

2009); <u>Feinberg v. Katz</u>, No. 99-cv-45, 2002 WL 1751135, at \*12 & n.2 (S.D.N.Y. July 26, 2002) (noting that the Second Circuit has disapproved of the reasoning underlying <u>Goldfine</u>).

### c.   The Enterprise is a Continuing Unit

Next, all four groups of Moving Defendants dispute that Plaintiffs adequately pled that the enterprise is a "continuing unit."  In Moving Defendants' Motions to Dismiss, the crux of their contentions on this element is that Defendants acted separately, pursued their own interests, and lacked the type of coordination required for an association-in-fact enterprise.  (<u>See</u> Doc. No. 22 at 27; Doc. No. 81 at 16; Doc. No. 82 at 17–18; Doc. No. 84 at 23–24).  Given Moving Defendants' characterization of the "continuing unit" element as a lack of coordination between different actors in the enterprise, the Court construes their challenge as attacking structural features of Plaintiffs' alleged enterprise, such as a common purpose and relationships among those associated with the enterprise.  <u>See</u> <u>Boyle</u>, 556 U.S. at 944–45 (quoting <u>Turkette</u>, 452 U.S. at 583) (stating that an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and its existence is proven by evidence "that the various associates function as a continuing unit.")  In response, Plaintiffs state that Defendants' enterprise "functioned as a continuous unit for the purpose of defrauding Plaintiffs and other End Users through a Ponzi scheme" and specifically cite instances when Defendants worked in concert to facilitate such fraud against Plaintiffs.  (<u>See</u>, <u>e.g.</u>, Doc. No. 91 at 14–16; Doc. No. 94 at 18–19).

In <u>Boyle</u>, the United States Supreme Court rejected formal structural requirements for an enterprise-in-fact, stating:

> Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times.

The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

556 U.S. at 948.

In the present case, Plaintiffs have alleged sufficient facts at the Motion to Dismiss stage to satisfy the minimal standards to establish a continuing unit. As noted above, Plaintiffs label the association-in-fact enterprise as the "Wireless Ponzi Scheme," which was orchestrated by WG and SWS and their principals and officers, included Dwayne Ratliff, Jason Dumas, and James Cunningham. As alleged in the FAC, Ratliff, Dumas, and Cunningham spearheaded the Pattern of Life Program, withheld the true nature of WG's relationship with Intel, solicited investments from End Users like Plaintiffs, and siphoned money to SWS and a non-defendant entity of the enterprise, C&M Consultants. (Doc. No. 67 ¶ 50–51, 92–94, 151; Exs. F, H, K.) WG and its principals and officers, in turn, contracted with United Defendants as their exclusive Box installer. (Id. ¶ 45.) Additionally, to generate new investment in the scheme, WG relied on a host of resellers—namely, JPC Defendants and Data Tech Defendants—to achieve a common purpose of extracting capital from End Users like Plaintiffs. (Id. ¶ 56.) Though Plaintiffs have not alleged formal features associated with a traditional criminal organization, Boyle makes clear that Section 1962(c) does not require them. See 556 U.S. at 948. Thus, the "informal hierarchal structure" alleged in the FAC plausibly alleges a continuing unit.

A second reason reinforces this conclusion. Although Moving Defendants argue they were merely pursuing their own business interests and lacking the type of relationship or purpose that would bind them to each other, the allegations in the FAC tell a story of mutual collaboration and reinforcement of each other—all with the goal of extracting money from Plaintiffs. As an

56

initial matter, courts do not require collaboration between every member of a hierarchal enterprise, even among low-level participants. See Coleman v. Commonwealth Land Title Ins. Co., No. CIV. 09-679, 2013 WL 4675713, at *6 (E.D. Pa. Aug. 30, 2013) (citations omitted) ("[A] RICO enterprise may be shown through proof of a hierarchical structure and without evidence that the lower level members of the enterprise collaborated directly with each other.") Even so, the FAC includes—but is not limited to—examples of coordination between members of WG's enterprise that evince a relationship and common purpose between Defendants based on their desire to extract money from End Users like Plaintiffs. Drawing all reasonable inferences in Plaintiffs' favor, the following examples—when read together—plausibly allege a continuing unit:

- JPC and Data Tech had WG's permission to resell Boxes to Plaintiffs. (Doc. No. 67 ¶ 20, 25). In return, WG paid JPC, Data Tech, and United with money from new End User investors instead of from Box data monetization as reflected in "revenue" statements, which they then showed to Plaintiffs to induce more investment. (Id. ¶ 72, 79, 98).

- Data Tech Defendants and United Defendants had access to WG's internal computer system called HubSpot, which "monitored and tracked" Box sales, purchase prices, and deliveries. (Id. ¶ 96.)

- JPC, Data Tech, and James Cunningham had access to WG's contract with Intel, which was central to inducing investment from End Users like Plaintiffs. (Id. ¶ 52, 90, 100, 109, 138.) In the contract, Intel did not agree to purchase data from Boxes.

57

- Michael Boothe routinely flaunted his close relationship with founder and CFO Dwayne Ratliff and represented that he met with Ratliff every week.  (Id. ¶ 93, 108.)

- James Cunningham boasted of his involvement with WG's Pattern of Life Program "since its inception."  (Id. Ex. F.)

- Anthony Amado instructed Plaintiffs' principals to create a separate legal entity to facilitate Box purchases, and told Plaintiffs that Michael Boothe, Joseph Jacobs, and Dwayne Ratliff "worked together" to design a "process for all [of Plaintiffs'] deals."  (Id. ¶ 86.)

- Joseph Jacobs or Michael Boothe hosted several in-person events in Pennsylvania, New Jersey, and Florida where they introduced Plaintiffs to participants in the enterprise, including Barry Caldwell, Anthony Amado, Dwayne Ratliff, David Boothe, Eric Howlett, and James Cunningham.  (Id. ¶ 69, 82, 91, 111, 113.)

- Barry Caldwell and Michael Boothe told Plaintiff to pay United and Eric Howlett for installation fees.  (Id. ¶ 119.)

- Data Tech Defendants and United Defendants directed the delivery and installation of Boxes Plaintiffs purchased from JPC.  (Id. ¶ 102.)  Although Plaintiffs purchased these Boxes from JPC, they allegedly received "data monetization" payments on them from Data Tech.  (Id. ¶ 103.)

- Michael Boothe and Joseph Jacobs told Plaintiffs that Dwayne Ratliff earmarked 180 Boxes for Plaintiffs, despite high demand from other potential buyers.  (Id. ¶ 93–94.)

- Just one day after Michael Boothe offered Plaintiffs a limited time offer to purchase Boxes at a discount, Joseph Jacobs texted Plaintiffs with encouraging news about the long-term viability of WG.  (Id. ¶ 133–35.)

- Joseph Jacobs gave Michael Boothe $50,000 and a Rolex watch.[28]  (Id. ¶ 110.)

- Eric Howlett and Michael Boothe hosted Plaintiff at Data Tech and United's headquarters in Wisconsin, where they held a Zoom call with Plaintiffs' close friends and family to solicit more investments.  (Id. ¶ 93–95.)

At the Motion to Dismiss stage, the Court is bound to accept Plaintiffs' rendition of the facts.  Because the FAC, in turn, is rife with examples of coordination between Defendants to accomplish their shared purpose of defrauding End Users, Plaintiffs have plausibly alleged a continuing unit.  Accordingly, the Court will move on to the two remaining categories of RICO arguments asserted by Moving Defendants, which concern the "conduct or participate" element and the pattern of racketeering activity element.

### 2.  "Conduct or Participate"

After the enterprise prong, the second category at issue in this case is the "conduct or participate" element of Section 1962(c).  Only United Defendants, consisting of United and Eric Howlett, argue that they did not "conduct or participate, directly or indirectly, in the conduct" of

---

[28]  In United Defendants' and Cuningham's Motion to Dismiss, they note that JPC Defendants and Data Tech Defendants were in competition with one another, which shows that each defendant group was acting in its own interests.  (Doc. No. 22 at 27; Doc. No. 81 at 16.)  While Michael Boothe convinced Plaintiffs to purchase Boxes from Data Tech instead of JPC, there are examples—as listed above—of collaboration and coordination between Data Tech and JPC.  See Ins. Brokerage Antitrust Litig., 618 F.3d at 376–77 (finding the Boyle requirements satisfied despite the lower-level members bidding over similar business opportunities).  At the Motion to Dismiss stage, these examples must be viewed in the light most favorable to Plaintiffs.

the enterprise's affairs.[29]  18 U.S.C. § 1962(c).  United Defendants argue that Plaintiffs' RICO

claim fails because United and Eric Howlett did not "operate or manage" the alleged enterprise;

rather, they conducted their own affairs by installing Boxes.  (Doc. No. 22 at 23–25; Doc. No. 79

at 8–9) (citing Reves, 507 U.S. at 185).  In their Response, Plaintiffs point to allegations in their

FAC purporting to show how United Defendants conducted or participated in the enterprise's

affairs.  These included United Defendants' exclusive contract to install Boxes, access to WG's

internal computing system, solicitation of End Users like Plaintiffs, and demand for installation

fees.  (Doc. No. 91 at 19–20.)

The United States Supreme Court in Reves determined that the verbs "conduct" and

"participate" involve an element of direction—that is, a RICO defendant must direct or "have

some part in directing" the affairs of the enterprise.  Reves, 507 U.S. at 178–79.  Accordingly, "to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs . . . one

must participate in the operation or management of the enterprise itself."  Id. at 185.  The

"operation or management" test does not reserve liability for upper-level management, because

"lower rung participants in the enterprise who are under the direction of upper management

Section 1962(c)" can also operate an enterprise.  Id. at 184.  However, Section 1962(c) "cannot

be interpreted to reach complete 'outsiders' because liability depends on showing that the

defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own

affairs."  Id. at 185 (emphasis in original).  As a result, the Third Circuit has required "a nexus

between the person and the conduct in the affairs of an enterprise."  United States v. Parise, 159

F.3d 790, 796 (3d Cir. 1998).

---

[29]  Other Moving Defendants characterize the remainder of their RICO claims as defenses
      falling under the pattern of racketeering element.

Here, Plaintiffs have plausibly alleged that United Defendants conducted or participated in the conduct of the enterprise's affairs. According to the facts alleged in the FAC, United Defendants had a nexus to the affairs of the enterprise, as exhibited by their integral role in it. First, United was the exclusive installer of Boxes nationwide and directed the shipment of at least some Boxes that Plaintiff received. (Doc. No. 67 ¶ 45, 102.) The routine delivery and installation of Boxes—though downstream from actions of WG's principals and JPC and Data Tech resellers—were crucial to maintaining the illusion that WG's enterprise was a legitimate enterprise worthy of investment by End Users. See (Doc. No. 91 at 19 n.5) ("Neither Plaintiffs nor any reasonable End User would have contributed capital to the Ponzi scheme if Wireless Guardian had no plan to actually install the Boxes."); see also Parise, 159 F.3d at 797 (holding that a defendant acting at the direction of an upper-level operator still "participated" in an enterprise's affairs by securing more business for the upper-level operator).

Second, United Defendants' role was not limited to installations, but also included personal solicitation of End Users like Plaintiffs to purchase Boxes and pay related fees— activities that were central to the enterprise. (See, e.g., Doc. No. 67 ¶ 97, 98, 111, 119, 122.) Finally, United Defendants' access to WG's internal computer system, HubSpot, illustrates that they were not merely carrying out "their own affairs" by installing Boxes. See Reves, 507 U.S. at 185. Rather, they participated in the enterprise's affairs by tracking nationwide sales, deliveries, and locations of WG's Boxes.[30] (Doc. No. 67 ¶ 96.)

---

[30] Some analysis on the "conduct or participate" prong borrows from the above analysis of the "enterprise" prong. The Third Circuit has approved of such overlapping, noting that "[t]he overlap between the District Court's analyses of these two elements is understandable. A defendant cannot participate in conducting the affairs of a non-existent enterprise." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 378 n.78.

United Defendants attempt to limit the extent of their involvement in the enterprise by pointing out that (1) installation was "carried out at the request of others," and (2) Eric Howlett made only a few statements regarding the profitability of WG's Pattern of Life Program. (Doc. No. 22 at 24–25.) However, when viewing the allegations in the FAC in the light most favorable to Plaintiffs, these arguments are unavailing for the reasons stated above.

For all these reasons, Plaintiffs have alleged enough facts to show that United Defendants conducted or participated in the conduct of the enterprise's affairs.

### 3. Racketeering Activity

The final element Plaintiffs must plausibly allege to show a violation of Section 1962(c) is the pattern of racketeering activity element. All four groups of Moving Defendants argue that this element has not been plausibly alleged in the FAC. Their contentions can be summarized as follows: (1) the predicate acts of wire and mail fraud do not demonstrate knowledge of the illicit Ponzi scheme by Defendants; (2) the predicate acts are not actionable or not attributable to a particular Defendant under the heightened pleading standards of Federal Rule of Civil Procedure 9(b); and (3) the racketeering scheme did not last long enough to state a claim under Section 1962(c). The Court will address each contention seriatim.

Regarding the first point, Data Tech Defendants and United Defendants argue that Plaintiffs fail to plead enough facts to infer knowledge of the predicate acts of fraud attributable to them and of the fraud scheme itself.[31] (See Doc. No. 84 at 17–22; Doc. No. 22 at 16–18.) The thrust of their contention is that the FAC fails to plausibly show Eric Howlett and Michael and

---

[31] Because Data Tech Defendants and United Defendants make this argument not just for Plaintiffs' 1962(c) claim, but also for the RICO conspiracy claim and the Pennsylvania state law claims involving intentional fraud—including fraudulent misrepresentation and aiding and abetting fraud—much of the analysis here applies to the merits of those claims.

David Boothe, the principals of United and Data Tech, had the requisite knowledge under Rule 9(b) of the false premise underlying the WG Ponzi scheme: that WG was monetizing Box data by selling it to Intel and other entities.  Plaintiffs respond by citing the more lenient standard under Rule 9(b) for conditions of mind, and submit that there is enough evidence to infer knowledge.  (Doc. No. 94 at 23 n.6; Doc. No. 91 at 35–37.)  Plaintiffs' rebuttal is persuasive.

The RICO Act provides a list of predicate racketeering activities, which include mail and wire fraud.[32]  18 U.S.C. § 1961(1).  Because Plaintiffs alleges racketeering activities rooted in fraud, they must meet the standard set forth in Federal Rule of Civil Procedure 9(b), which states: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  However, Rule 9(b) also provides that "[m]alice, intent, [and] knowledge, and other conditions of a person's mind may be alleged generally."  Id.  A court can rely on circumstantial evidence to infer a defendant's knowledge.  See Liberty Bell Bank v. Rogers, 726 F. App'x 147, 154–55 (3d Cir. 2018); Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997).  In a RICO case, a plaintiff must show not just that a defendant participated in racketeering activity knowingly, but also that a defendant

---

[32]    Mail fraud and wire fraud are codified at 18 U.S.C. § 1341 and § 1343, respectively.

> "The essential elements of an offense under 18 U.S.C. § 1341 are (1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme."  United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994) (footnote omitted).  "The wire fraud statute, 18 U.S.C. § 1343, is identical to the mail fraud statute except it speaks of communications transmitted by wire," United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994), although wire fraud does require an interstate transmission, while mail fraud does not have a similar requirement.

Irish v. Ferguson, 970 F. Supp. 2d 317, 357 (M.D. Pa. 2013)

participated with knowledge of the overarching fraudulent scheme.  See United States v. Dobson, 419 F.3d 231, 237 (3d Cir. 2005).

In the present case, the FAC contains extensive allegations, which, when accepted as true, support the inference that Data Tech Defendants and United Defendants had knowledge of the true relationship between WG and Intel, an integral part of the fraud.  First, as resellers of WG's Boxes and early investors in the WG Ponzi scheme, Michael and David Boothe had a financial motive to misrepresent the value of Boxes in order to recoup their investment and profit from it. See Weiner, 129 F.3d at 318 n.8 (stating that scienter "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud.").  The same is true for Eric Howlett, who received fees for installing Boxes purchased by End Users.  Second, Eric Howlett and United's role as sole installer of Boxes granted them an elevated position in the WG Ponzi scheme.  Third, Michael Boothe boasted of his close relationship and frequent meetings with Dwayne Ratliff, the alleged mastermind behind the WG Ponzi scheme who eventually admitted that Intel was not purchasing data from WG.[33]  Fourth, Eric Howlett and the Boothes held unique roles in the WG Ponzi scheme by having access to WG's internal computing systems.  Fifth, the FAC claims that the Boothes siphoned money from Data Tech's Box sales "to shield Defendants' ill-gotten gains from suits like this."  (Doc. No. 67 ¶ 59, 88).  When taken together, Plaintiffs

---

[33]  United Defendants submit that Ratliff's admission of wrongdoing in a 2024 letter absolves United Defendants of knowledge.  (Doc. No. 22 at 17–18.)  Specifically, the letter stated that WG had not been selling Box data to Intel and that the decision instead to "inventory" this data "was a decision made solely by the Board of Directors and was not known to any other Wireless Guardian employees, managers, or executives."  (Doc. No. 67 ¶ 139, Ex. H.)  But United Defendants were not "employees, managers, or executives" of WG.  And more importantly, it would be inappropriate—especially at the Motion to Dismiss stage—to credit the words of Ratliff over the allegations in the FAC, which must be viewed as true and which are sufficient to infer knowledge by United Defendants.

plausibly allege that Data Tech Defendants and United Defendants had knowledge of the underlying scheme.

Regarding the second point, United Defendants and James Cunningham argue that Plaintiffs' allegations of racketeering activity are either not actionable or not attributable to them under the heightened pleading standards of Rule 9(b).  (Doc. No. 22 at 18–22; Doc. No. 81 at 19–25.)  As stated above, Rule 9(b) provides "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Specifically, this means that a plaintiff "must describe the circumstances of the alleged fraud with precise allegations of date, time, or place or otherwise use some means of injecting precision and some measure of substantiation into their allegations of fraud."  Ketner, 2021 WL 2808829, at *8 (internal quotation marks and citation omitted).  Importantly, "[i]t is the 'person' charged with the racketeering offense—not the entire enterprise—who must engage in the 'pattern of racketeering activity.'"  Bergrin, 650 F.3d at 267 (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 244 (1989)).  United Defendants and James Cunningham contest under Rule 9(b) the sufficiency of the allegations of mail and wire fraud in which they are named.  (Doc. No. 81 at 23–25; Doc. No. 22 at 18–20.)

But an examination of the FAC and RICO Case Statement demonstrates that Plaintiffs have properly alleged a pattern of racketeering activity engaged in by both groups of Defendants.  And as a threshold matter, the Court need not analyze every predicate act that United Defendants or James Cunningham claim is insufficient because a "pattern of racketeering activity" only requires two acts committed within ten years of one another.  See 18 U.S.C. § 1961(5).

The first instance of United Defendants' participation in the wire fraud occurred on November 7 or 8, 2023, when Eric Howlett held a Zoom call over interstate wires from his base

65

in Wisconsin.  Joined by Michael Boothe, Eric Howlett also hosted Dwayne Ratliff in Georgia and Plaintiffs' close friends and family in Pennsylvania.  (Doc. No. 67 ¶ 97.)  During the Zoom call, Eric Howlett took part in soliciting Plaintiffs to invest in the Pattern of Life Program.   This participation continued when United and Howlett directed the delivery and installation of 29 of Plaintiffs' Boxes using U.S. mail between November 8, 2023 and June 4, 2024.[34]  (Doc. No. 67 ¶ 102, Ex. E.)  In their FAC, Plaintiffs attach an itemized list of Box purchases from a letter they sent in 2024, which includes, inter alia, (1) the location of each delivered Box, (2) the date each Box was installed, and (3) the name of the reseller from whom they purchased each Box.  (Id. Ex. E.)  These facts are specific enough to provide the date, time, place, method, and other details that "inject[] precision and some measures of substantiation" into the predicate acts of fraud.  See Ketner, 2021 WL 2808829, at *8.  Thus, the FAC satisfies the heightened specificity in pleading required by Rule 9(b) as to United Defendants' predicate acts.[35]

---

[34]  Plaintiffs note that every Box mailed to them constituted a predicate act of mail fraud by United Defendants.  See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3d Cir. 1991) ("[E]ach mailing that is incident to an essential part of the scheme constitutes a new violation.").  "Although a defendant must cause a mailing in furtherance of a fraud, that mailing may be incidental to the fraud, and the defendant need not personally send the mailing or even intend that it be sent."  United States v. Tiller, 302 F.3d 98, 102 (3d Cir. 2002).  To "cause" a mailing, a defendant "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen."  Id. (quoting Pereira v. United States, 347 U.S. 1, 8–9 (1954)).  To the extent Plaintiffs contend that United Defendants caused mailings of Boxes in furtherance of the WG Ponzi scheme, the allegations in the FAC raise such a plausible inference.  Eric Howlett had access to WG's internal computer system that tracked Box deliveries and locations around the country.  Moreover, United's role as installer for Boxes nationwide was critical to maintaining the illusion held by End Users that WG Boxes were worthy of continued purchase and shipment.  Without United Defendants agreeing to install Boxes, many End Users may not have purchased Boxes to be shipped through U.S. mail.  See Tabas, 47 F.3d at 1294 n.18 (holding that mailings satisfied the mail fraud statute because "[h]ad the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have immediately been alerted to defendants' alleged scheme.").

[35]  United Defendants do not seem to contest whether these acts satisfy the elements of federal

The same is true for James Cunningham.  Plaintiffs have attached an exhibit showing that Cunningham "siphoned off" a total of $2.4 million from Box purchases to an entity that he controlled, C&M Consultants, over the course of 53 interstate bank wires from Georgia to Virginia.  (Doc. No. 67 ¶ 51, Ex. A.)  Each wire lists a date, a sender, a recipient, and a monetary amount.  (See id. Ex. A.)  Siphoning money through interstate wires can be a predicate act of wire fraud.  See Tredici Enoteca, LLC v. Dodge, No. 20-cv-4112, 2021 WL 3051916, at *4 (E.D. Pa. July 19, 2021).  In addition, Plaintiffs have attached a letter dated April 26, 2024 sent over U.S. mail and interstates wires from newly-appointed CEO Cunningham to WG customers.  (See id. ¶ 130–31, Ex. F; Doc. No. 68-4 at 6.)  In the letter, Cunningham attempted to assuage growing concerns with WG's "transparency, accountability, and responsiveness," and advertised new Box software that would lead to more lucrative data monetization.  (Id.)  Because Cunningham's letter can plausibly be read as an attempt to maintain End Users' trust in WG and to continue the scheme, Plaintiffs have adequately alleged that it was a predicate act of fraud. See Tabas, 47 F.3d at 1294 n.18 (quoting Kehr Packages, 926 F.2d at 1416 n.3) ("Indeed, mailings 'designed to lull [fraud] victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place' have been found to constitute actionable mail fraud.").  At its core, James Cunningham's argument relies on providing an innocent explanation for each predicate act.  (See, e.g., Doc. No. 81 at 24) ("As a reseller, the [siphoned] money was sent to C&M to deliver to End Users, similarly to the arrangement between Plaintiffs and the Reseller

---

mail or wire fraud.  Regardless, Plaintiffs have sufficiently alleged all the necessary elements of mail and wire fraud under 18 U.S.C. § 1341 and § 1343.  Plaintiffs have alleged (1) an alleged Ponzi scheme to defraud End Users, (2) participation in the scheme by United Defendants, and (3) the use of U.S. mail or interstate wires in furtherance of that scheme.

Defendants."). At the Motion to Dismiss stage, though, accepting Cunningham's interpretation of the facts instead of Plaintiffs' plausible allegations would be improper.

Regarding the third argument on the "pattern of racketeering activity" prong, JPC Defendants contend that Defendants' racketeering activity did not last long enough to state a claim under Section 1962(c).[36]  (Doc. No. 82 at 15–17.)  The primary thrust of JPC Defendants' contention is that Plaintiffs have failed to allege the requisite continuity of racketeering activity in their FAC.  (Id. at 16–17.)  Specifically, JPC Defendants maintain that the pattern of racketeering activity in this case fails to satisfy either closed-ended or open-ended continuity.

In addition to pleading a pattern of racketeering activity, a plaintiff must prove two further elements: (1) relatedness of predicate acts and (2) continuity of those acts.  See Bergrin, 650 F.3d at 267 (3d Cir. 2011).  Only continuity is at issue here.  As noted earlier, continuity may

---

[36]  JPC Defendants briefly argue that Plaintiffs lack standing under RICO because Plaintiffs are three LLCs (AR Network LLC, A&R Enterprises, LLC, and Teometrix LLC) that did not exist prior to September 2023.  (Doc. No. 82 at 15–16.)  Because Plaintiffs could not have "suffered any damages or injury before their creation[,]" JPC Defendants argue that Plaintiffs lack standing.  (Id.)  "To have standing under civil RICO, a plaintiff must allege that it suffered an injury to its business or property interest 'by reason of a violation of section 1962.'"  Penn Mont Sec. v. Frucher, 502 F. Supp. 2d 443, 466 (E.D. Pa. 2007) (quoting 18 U.S.C. § 1964(c)).  "The 'by reason of' provision means the complaint must allege that defendants' RICO violation proximately caused injury to the plaintiff's business or property."  Id. (citing Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 274 (1992)).

Tellingly, JPC Defendants' argument fails to state either of the following: (1) that Plaintiffs—as LLCs—were never harmed after their creation, and (2) that JPC Defendants' RICO violations did not proximately cause such harm.  Instead, they merely state that Plaintiffs could not have suffered harm prior to September 15, 2023, when Plaintiffs were allegedly created as LLCs.  (Doc. No. 67 ¶ 85.)  Even if the Court accepts JPC Defendants' proposition as true, it does not undermine Plaintiffs' standing under RICO because Plaintiffs—as then-existing LLCs—spent $1.6 million on valueless Boxes from JPC on September 24, 2023, and spent another $1.5 million on Boxes from JPC a few months later.  (Id. ¶ 87, 104.)  Because the FAC alleges how JPC Defendants spent months soliciting these purchases and misrepresenting the profitability of the WG Ponzi scheme, Plaintiffs' monetary injuries confer standing.

68

be characterized as closed-ended or open-ended, and either may be alleged.  See id. (citation omitted).  Closed-ended continuity is "a closed period of repeated conduct . . . [that] can be established 'by proving a series of related predicates extending over a substantial period of time.'"  Germinaro, 737 F. App'x at 10 (citation omitted).  The meaning of "substantial" has not been defined with a definitive timeline by the Third Circuit.  Open-ended continuity, by contrast, consists of "past conduct that by its nature projects into the future with a threat of repetition."  Bergrin, 650 F.3d at 267.  The threat of repetition "exists when the predicate acts are a part of defendant's 'regular way of doing business' ... [or the] defendant operates a 'long-term association that exists for criminal purposes.'"  Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 609–10 (3d Cir. 1991) (citation omitted).

JPC Defendants suggest that the way to measure closed-ended continuity of a pattern of racketeering activity is to start when a plaintiff suffers some harm.  (Doc. No. 82 at 16.)  In Plaintiffs' case, then, JPC Defendants submit (1) the continuity period should start in June or September 2023 because that is when Plaintiffs began suffering damages, and (2) the continuity period should end when the WG Ponzi scheme unraveled in June 2024.  On the other hand, Plaintiffs note that closed-ended continuity is measured from the first predicate act of racketeering to the last act of racketeering.  Under Plaintiffs' conception, the continuity period began when Joseph Jacobs committed wire fraud on January 5, 2023 by arranging a meeting with Plaintiffs over text messages to discuss the Pattern of Life Program (Doc. No. 67 ¶ 63), and ended—at the earliest—when James Cunningham held a final Zoom meeting with Plaintiffs on July 3, 2024.  (Doc. No. 93 at 22.)

Plaintiffs' understanding of closed-ended continuity requirement is sound.  Much like the relatedness prong, the continuity prong concerns the relationship between predicate acts—not

69

between instances of harm suffered by victims of the wrongful acts.  See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 242 (1989) ("A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.")  The Third Circuit has adopted a potentially more expansive understanding of the continuity requirement by beginning with the "instances of deceit constituting the underlying fraudulent scheme"—even if those instances are not the fraudulent mailings or fraudulent wirings.  Kehr Packages, 926 F.2d at 1414; see also Tabas, 47 F.3d at 1294.

In this case, Plaintiffs adequately pled closed-ended continuity.  The enterprise's predicate acts lasted for a period of at least 18 months, from the first instance of Joseph Jacobs' text-based solicitation in January 2023 to the final Zoom call with James Cunningham in July 2024.[37]  (See Doc. No. 67 ¶ 63, 150–51).  Under Third Circuit precedent, this period of continuity is sufficient.  See Swistock v. Jones, 884 F.2d 755, 759 (3d Cir. 1989) (holding that, at the motion to dismiss stage, a fourteen month period of conduct may be sufficient to establish closed-ended continuity); United States v. Pelullo, 964 F.2d 193, 209 (3d Cir. 1992) ("We believe that a jury could find this period [of nineteen months] sufficient for a finding of continuity.").

Accordingly, Plaintiff has adequately alleged a violation of Section 1962(c) against all Moving Defendants.[38]

---

[37]  Plaintiffs also have alleged that agents of Jacobs and JPC committed a predicate act after July 2024.  (See Doc. No. 67 ¶ 169, Ex. M.)  The agents are DMRP, a Wyoming LLC, and DMRP's principal, Jon Gilby.  (Id. ¶ 166, 169.)  If true, Plaintiffs may be able to prove an extended period of closed-ended continuity.

[38]   As a final matter on Section 1962(c), both JPC Defendants and Data Tech Defendants suggest that a pattern of racketeering activities requires a significant number of perpetrators and victims.  (See Doc. No. 82 at 17; Doc. No. 84 at 20, 22.)  But neither elaborate on this point or cite to caselaw stating that a RICO claim is insufficient if the number of victims or

### b.  RICO Claim #2: 18 U.S.C. § 1962(d) ("Section 1962(d)")

### i.    Relevant Law: Section 1962(d)

18 U.S.C. § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  When pleading a violation of § 1962(d), "a plaintiff must allege (1) agreement to commit the predicate acts . . . and (2) knowledge that those acts were a part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c)."  Gratz v. Ruggiero, No. 16-cv-3799, 2017 WL 2215267, at *3 (E.D. Pa. May 19, 2017) (cleaned up) (quoting Grant v. Turner, 505 Fed. App'x 107, 112 (3d Cir. 2012)).  Unlike many conspiracy causes of action, Section 1962(d) does not require an overt act "to effect the object of the conspiracy."  Salinas v. United States, 522 U.S. 52, 62 (1997).  Without a plaintiff adequately pleading the substantive RICO violation in Section 1962(c), to move forward on a Section 1962(d) conspiracy claim, he must allege "an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense."  Ins. Brokerage Litig., 618 F.3d at 383.

### ii.    Analysis: Section 1962(d)

All four groups of Moving Defendants contend that Plaintiffs fail to state a claim under Section 1962(d).  In this regard, Moving Defendants make two arguments, which can be described as follows:  (1) since Plaintiffs' substantive RICO claim under Section 1962(c) is deficient, Plaintiff's conspiracy claim under Section 1962(d) also must fail;  and (2) Plaintiffs do not sufficiently plead that Defendants had the requisite knowledge or agreement to conspire with each other.

---

perpetrators is not significant.  Because the Court also cannot locate such caselaw, this issue need not be addressed further.

First, Moving Defendants argue that Plaintiffs' RICO conspiracy claims must be dismissed due to the insufficiency of their substantive RICO claim under Section 1962(c). (See, e.g. Doc. No. 81 at 25) (citing Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 430 (E.D. Pa. 2014)). Because Plaintiffs have adequately alleged their Section 1962(c) claim against all Moving Defendants as discussed earlier, this argument lacks merit. Likewise, Data Tech Defendants' additional contention—that Plaintiffs' RICO conspiracy claim fails because the predicate acts of mail and wire fraud were not adequately pled under Rule 9(b)—suffers the same fate for the same reason.[39] (See Doc. No. 84 at 17–19.)

Second, Moving Defendants dispute that Plaintiffs have sufficiently alleged the two elements of Section 1962(d) that they must plead at this stage, including (1) an agreement among co-conspirators to commit mail and wire fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity. (See Doc. No. 22 at 28–29, Doc. No. 81 at 25–26; Doc. No. 82 at 18–19; Doc. No. 84 at 26–27.) But the FAC contains sufficient facts to infer both. In demanding that Plaintiffs must point to some actual agreement or some admission of knowledge, Moving Defendants set the bar too high—especially at this stage in the case. See United States v. Williams, 974 F.3d 320, 370 (3d Cir. 2020) (noting that each element of a conspiracy "may [be] prove[n] . . . solely through circumstantial evidence.").

The following allegations from the FAC are sufficient to plausibly infer an agreement between members of the enterprise to commit predicate acts: Joseph Jacobs hosting multiple

---

[39]   Regarding the conspiracy claim, Data Tech Defendants also refer to Fed. R. Civ. P. 9(b) pleading standard. But this Rule does not apply to the conspiracy claim. See Odesser v. Cont'l Bank, 676 F. Supp. 1305, 1313 (E.D. Pa. 1987) ("Plaintiff is correct that allegations of conspiracy [under Section 1962(d)] are not measured under the rule 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal [R]ule 8 pleading standard.").

events where James Cunningham, Michael Boothe, Anthony Amado, and Barry Caldwell met and solicited Plaintiffs;  Amado instructing Plaintiffs to create a new corporate entity for its Box purchases, assuring Plaintiffs that Michael Boothe, Joseph Jacobs, and Dwayne Ratliff "worked together" to design "a process for all [of Plaintiffs'] deals;  frequent collaboration between JPC, Data Tech, and Dwayne Ratliff to drum up interest in Boxes and solicit more investments from Plaintiffs;  JPC and Data Tech directing all of their installation contracts to United Defendants;  Barry Caldwell and Michael Boothe successfully pressuring Plaintiffs to pay United Defendants for installation fees;  Data Tech sending Plaintiffs "data monetization" revenue from Boxes that Plaintiffs purchased from JPC;  Joseph Jacobs sending Michael Boothe $50,000 and a Rolex; and David Boothe acting as a liaison between WG and Data Tech when Plaintiffs complained of late Box deliveries.

Similarly, the following allegations are sufficient to plausibly infer knowledge that the predicate acts constituted a pattern of racketeering activity prohibited by Section 1962(c):  James Cunningham's management of the Pattern of Life Program's sales, technology, and data since the Program's inception;  James Cunningham and Joseph Jacobs had access to WG's full contract with Intel, and Jacobs repeated refusal to allow Plaintiffs the opportunity to inspect the contract with Intel;  United Defendants and Data Tech Defendants had privileged access to WG's internal computing system, HubSpot, which provided important information about WG's Box operation; Michael Boothe had a close personal relationship with Dwayne Ratliff, the alleged mastermind of the WG Ponzi scheme;  and Jacobs, James Cunningham, and the Boothe brothers siphoning investments from End Users to other corporate entities that they controlled.

Taken together, these averments constitute more than bare allegations of knowledge and an agreement.  And drawing all reasonable inferences in Plaintiffs' favor, they are sufficient to

infer the existence of a conspiracy to commit the underlying RICO offense in Section 1962(c). Accordingly, Plaintiffs' Section 1962(d) claim is sufficiently pled.

### D.  State Law Claims (Counts I, II, III, VI, VII, VIII, IX)

#### a.  Fraudulent Misrepresentation and Concealment (Counts I, II)

Under Pennsylvania law, the tort of fraudulent misrepresentation has six elements: "1) a representation; 2) that is material to the transaction at issue; 3) made falsely, with knowledge of its falsity or reckless disregard as to whether it is true or false; 4) with the intent to mislead another person into relying on it; 5) justifiable reliance; and 6) an injury proximately caused by the reliance." Rosenberg as Tr. of Douglas Rosenberg 2004 Tr. v. PHL Variable Ins. Co., No. 23-1234, 2024 WL 2012486, at *5 (3d Cir. May 7, 2024) (quoting Gregg v. Ameriprise Fin., Inc., 245 A.3d 637, 645–46 (Pa. 2021)).

To be liable for concealing information, a defendant must have "an independent duty to disclose the omitted information." Estate of Evasew, 584 A.2d 910, 913 (Pa. 1990); see also Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund, 82 A.3d 485, 500–501 (Pa. Commw. Ct. 2013) (noting that Pennsylvania has adopted Restatement (Second) of Torts § 551, which enumerates duties between parties in a business transaction).  If no independent duty to disclose exists, there must be some "active concealment," which involves an intentional act calculated to deceive the other party.  See Gnagey, 82 A.3d at 500–04 (noting that Pennsylvania has also adopted Restatement (Second) of Torts § 550, which imposes liability for active concealment regardless of a duty to disclose).

In their FAC, Plaintiffs assert two claims of fraudulent misrepresentation and concealment.  Plaintiffs' two claims are separated by the source of their damages:

- Count I involves Boxes that Plaintiffs purchased from JPC Defendants. (Doc. No. 67 ¶ 184.) In Count I, Plaintiffs name as Defendants the JPC Defendants and James Cunningham, along with WG, SWS, and Dwayne Ratliff.

- Count II involves Boxes that Plaintiffs purchased from Data Tech Defendants. (Id. ¶ 201). In Count II, Plaintiffs name as Defendants the Data Tech Defendants, United Defendants, and James Cunningham, along with WG, SWS, and Dwayne Ratliff.

### i.   JPC Fraud (Count I)

In their Motions to Dismiss, James Cunningham and JPC Defendants proffer a series of pleading deficiencies regarding the fraudulent misrepresentation and concealment alleged in Count I.

### 1.   James Cunningham

Cunningham identifies two deficiencies concerning fraudulent misrepresentation: (1) Plaintiffs attribute the actions of other Defendants to Cunningham through improper group-pleading (Doc. No. 81 at 26–29, 31–33); and (2) Cunningham lacked the requisite knowledge to commit fraud. (Id. at 29–31.) Plaintiffs respond that (1) Cunningham made at least two misrepresentations of his own that led them to purchase Boxes, and that his actions can be attributed to WG because he was an officer there, and (2) Cunningham's possession of the Intel contract demonstrates his knowledge of the scheme. (Doc. No. 92 at 29–33 & n.17).

Regarding fraudulent concealment, the purported deficiency is that Cunningham had no duty to Plaintiffs to disclose the Intel contract. (Id. at 33.) Plaintiffs counter that Cunningham's active concealment of the Intel contract is actionable under Pennsylvania law. Since Plaintiffs' first count of fraud focuses on Boxes purchased from JPC Defendants, the analysis will focus on Cunningham's actions—or inactions—which allegedly led them to purchase those Boxes.

### a. Misrepresentations

The crux of James Cunningham's first assertion is that Plaintiffs' fraudulent misrepresentation claims in Counts I and II improperly bunch different Defendants into one indistinguishable group. Because relevant misrepresentations must be attributable to him, Cunningham contends that statements from resellers like JPC Defendants and Data Tech Defendants cannot be used to show that he committed fraud. But the FAC includes a comment from Cunningham that allegedly led Plaintiffs to purchase additional Boxes from JPC. Specifically, at a fundraiser in New Jersey on October 26, 2023, Cunningham—at that time the Chief Information Officer responsible for "all sales and data"—met Plaintiffs and told them that WG's Pattern of Life Program was "real and profitable." (Doc. No. 67 ¶ 91–92.) Apparently encouraged by Cunningham's endorsement, Plaintiffs purchased an additional thirteen (13) Boxes from JPC on December 4, 2023. (Id. ¶ 104.)

Cunningham counters by downplaying the statement as a "one-off comment that . . . was after Plaintiffs decided to invest, and they did not make another investment until two months later and that investment was caused by resellers' conduct, not [Cunningham's] one comment." (Doc. No. 81 at 32.) But Cunningham's attempt to minimize his own conduct is unpersuasive. No caselaw is provided for the proposition that one statement is insufficient to induce reliance or cause injury in a fraud action. To the contrary, his reassurance—coming from a person with a high-level position within WG—that the Pattern of Life Program was "real and profitable" has been found in similar contexts to be actionable fraud. See Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 772 (3d Cir. 2009) (finding a defendant's statement that valueless technology was "proven" and "had been demonstrated" was enough to raise a genuine issue of material fact on causation prong in a Pennsylvania fraud action).

Cunningham's lack of knowledge argument fares no better. As noted supra, the pleading requirement for fraud in Rule 9(b) provides that states of mind may be alleged generally, and courts applying Pennsylvania law have held that actual knowledge may be inferred from circumstantial evidence. See Marion v. Bryn Mawr Tr. Co., 288 A.3d 76, 91 (Pa. 2023). Further, Pennsylvania's common law fraud is not limited to "actual knowledge," but also includes a "reckless disregard" of a statement's truth. Gregg, 245 A.3d at 645–46.

Here, the FAC contains two allegations that are sufficient to infer knowledge or recklessness. First, and most importantly, Cunningham had possession of WG's contract with Intel since March 28, 2023—well before his alleged misrepresentations to Plaintiffs. (Doc. No. 67 ¶ 52.) On its face, the Intel contract did not purport to cover WG selling Box data to Intel, but rather permitted WG to use Intel's software. (See Doc. No. 92 at 35) (examining other facial issues with the Intel contract). Second, Cunningham held other high positions at WG during his tenure, which culminated in him becoming CEO in April 2024. Given Cunningham's possession of the Intel contract and his extensive involvement in WG's operation before misrepresenting in New Jersey the nature of WG's success to Plaintiffs, his knowledge or reckless disregard of the statement's falsity can be inferred. At the least, by not examining the Intel contract before using it to court "potential [End User] victims and Resellers," he exhibited reckless disregard for the truth of WG's relationship with Intel. (Id. ¶ 52.)

In an effort to absolve himself of knowledge, James Cunningham points to two letters attached to the FAC purporting to show his lack of participation in or knowledge of the WG Ponzi scheme. (Doc. No. 81 at 30–31.) One letter is from Cunningham himself, written after the WG Ponzi scheme unraveled. The other letter is from Dwayne Ratliff, who Plaintiffs allege orchestrated the scheme. Giving credence to those letters over Plaintiffs' allegations is

77

impermissible at the Motion to Dismiss stage where the facts are viewed in the light most favorable to Plaintiffs.  Accordingly, Plaintiffs' allegation of fraudulent misrepresentation in Count I will withstand James Cunningham's Motion to Dismiss.

### b.  Concealment

Cunningham also claims that the "concealment" portion of Plaintiffs' fraudulent concealment and misrepresentation claim is insufficient because no fiduciary or contractual duty existed between Cunningham and Plaintiffs.  (Doc. No. 81 at 33.)  Cunningham is correct that no such duty exists, so his mere silence cannot state a claim under Pennsylvania state law.  See Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund, 82 A.3d 485, 500 (Pa. Commw. Ct. 2013).  In response, Plaintiffs point to more than mere silence by claiming that Cunningham "actively concealed" the truth about the WG Ponzi scheme.  (Doc. No. 92 at 33.)  As noted above, Pennsylvania law recognizes that—even in the absence of a duty—a cause of action for concealment exists by a defendant's "active concealment," which is designed to deceive another party.  It makes him or her liable for failing to disclose information. See Gnagey, 82 A.3d at 503.  Here, Cunningham's visit to New Jersey to tell Plaintiffs how the Pattern of Life Program was "real and profitable" could plausibly give rise to the inference that he intended to deceive Plaintiffs into purchasing more Boxes.  Therefore, the "concealment" claim alleged in Count I also will withstand James Cunningham's Rule 12(b)(6) Motion.

### 2.  JPC Defendants

In their Motion to Dismiss the FAC, JPC Defendants assert several insufficiencies in the fraudulent misrepresentation claim.[40]  First, JPC Defendants contend that Plaintiffs failed to adequately plead that they made fraudulent misrepresentations because Plaintiffs did not allege

---

[40]    JPC Defendants do not assert that the concealment portion of the claim is insufficiently pled.

facts demonstrating Defendant's knowledge or reckless disregard of the truth of their statements. (Doc. No. 82 at 19–20.)  Second, JPC Defendants claim that even if Plaintiff's claims were sufficiently pled, they are barred by the economic loss doctrine.  (Doc. No. 82 at 20–22.) Plaintiffs counter that they have satisfied the pleading standard of Rule 9(b), and that the claims of misrepresentation—either fraudulent or negligent—are not barred by the economic loss doctrine because the duty allegedly breached arises from a duty independent of the contract between the parties.[41]  (Doc. No. 93 at 24–30.)

First, JPC Defendants' argument that Plaintiffs fail to allege facts showing JPC Defendants knew or recklessly disregarded the fact that their statements were false is belied by the allegations in the FAC.  To reiterate, Rule 9(b) expressly provides that "knowledge" and other conditions of the mind may be alleged generally, and courts hold that scienter may be inferred from circumstantial facts.  See Weiner, 129 F.3d at 318 n.8 (holding scienter was adequately pled where allegations support a plausible inference of motive and opportunity); see also Marion, 288 A.3d 76, 91.

Here, Plaintiffs allege more than the threshold required by Rule 9(b).  JPC Defendants possessed the Intel Contract, which they then used to induce Plaintiffs to invest in Boxes.  When Plaintiffs asked for a copy of the Intel contract, JPC Defendants refused to provide a copy to Plaintiffs.  Instead, JPC Defendants offered only misleading screenshots of revenue statements, incomplete screenshots of the Intel contract, and text messages touting WG's viability and profitability.  (Doc. No. 67 ¶ 72, 73, 75, 100.)  When the Intel contract was finally produced, according to Plaintiffs, it was facially fraudulent and plainly did not oblige Intel to purchase Box data.  (Id. ¶ 90, 100.)  Moreover, and as noted previously, the Complaint alleges that JPC

---

[41]   A negligent misrepresentation claim is alleged in Count III.

Defendants coordinated closely with WG and other resellers on the mechanics of the scheme, motivated by the prospect of selling Boxes.  Because these allegations support the inference that JPC Defendants either knew their statements were false or consciously ignored their truth, the plausible inference arises that they acted with fraudulent intent, which satisfies Rule 9(b).  See B.O. v. C.O., 590 A.2d 313, 316 (Pa. Super. Ct. 1991) (holding that fraud also includes misrepresentations made in conscious ignorance of the truth).

Second, JPC Defendants argue that the economic loss doctrine bars recovery for Plaintiffs' misrepresentation claims, including the fraudulent and negligent misrepresentation claims.  But the economic loss doctrine does not bar a tort claim where a "legal duty exists independently from any contractual obligations between the parties."  Dittman v. UPMC, 196 A.3d 1036, 1056 (Pa. 2018).  The application of the doctrine "turns on the determination of the source of the duty plaintiff claims the defendant owed."  Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 288 (Pa. 2005).  Applying Pennsylvania law, the Third Circuit has held that "a precontractual duty not to deceive through misrepresentation or concealment exists independently of a later-created contract."  SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 217 (3d Cir. 2022).

Because Plaintiffs' tort claims concern pre-contractual inducements and misrepresentations about the legitimacy of the entire investment scheme—rather than the price and delivery obligations from the parties' contract—the economic loss doctrine does not apply here.  See Rosenberg v. Nassau Life & Annuity Co., 2022 WL 2718607, at *10–11 (E.D. Pa. July 13, 2022) (concluding that plaintiff's fraudulent and negligent misrepresentation claims were not barred by the economic loss doctrine because defendant had a duty not to defraud independent of its limited contractual obligation).  Here, the duty incumbent upon JPC from the verbal contract

80

between JPC and Plaintiff Teometrix LLC was to deliver Boxes within 45 days. (Doc. No. 67 ¶ 86, 104.) The obligation came after the misrepresentations about the Intel contract and the viability and profitability of the Pattern of Life Program. For these reasons, Plaintiffs' fraud and negligence claims are not barred by the economic loss doctrine.

Finally, JPC Defendants contend that the individuals in their group, including Anthony Amado, Barry Caldwell, and Joseph Jacobs, cannot be liable in their individual capacity for misrepresentations because they were solely acting as officers of JPC or Pacific Outdoors. (Doc. No. 82 at 26–28.) But under Pennsylvania law, a corporate officer is liable for his own torts, including fraud, even when acting within the scope of his employment. Walsh v. Alarm Sec. Grp., Inc., 95 F. App'x 399, 401 (3d Cir. 2004) (quoting Donsco Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978)) (reversing district court's dismissal of fraud claims because a corporate officer is "individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort."). As described previously, Anthony Amado, Barry Caldwell, and Joseph Jacobs each made their own misrepresentations, which is the source of their liability on the fraudulent misrepresentation claims. Therefore, JPC Defendant's argument that Amado, Caldwell, and Jacobs cannot be held personally liable for their misrepresentations is unavailing.[42]

Accordingly, Plaintiffs have adequately pled in Count I fraudulent misrepresentation and concealment.

---

[42] The cases that JPC Defendants rely on do not stand for the proposition that tort claims are barred against officers. Rather, each case concerns a corporation's contractual obligations. See JCA, Inc. v. EPC, Inc., No. 93-cv-0730, 1993 WL 274190, at *2 (E.D. Pa. July 1, 1993) (reciting Pennsylvania law relating to corporate contracts with third parties, and, even then, refusing to dismiss plaintiff's claim); Riseman v. Advanta Corp., 39 F. App'x 761, 767 (3d Cir. 2002) (holding in favor of individual defendants on plaintiff's detrimental reliance claim as based on contract law).

### ii. Data Tech Fraud (Count II)

In Count II, Plaintiffs allege another claim of fraudulent misrepresentation and concealment, but focus on Boxes purchased from Data Tech.  Plaintiffs again name James Cunningham as a Defendant in this Count, and also name as Defendants Data Tech Defendants and United Defendants. The Court will first address James Cunningham, and then will address Data Tech Defendants and United Defendants together, as both groups assert similar insufficiencies in Count II.

### 1. James Cunningham

In his Motion to Dismiss, James Cunningham does not differentiate between the fraud claims asserted against him in Counts I and II.  (Doc. No. 81 at 26–33.)  For this reason, most of his arguments on fraud have already been disposed of in the analysis of JPC's Box fraud alleged in Count I.  Those arguments were that he (1) lacked knowledge of WG's relationship with Intel, and (2) concealed that relationship from Plaintiffs.  However, in regard to Boxes purchased from Data Tech, Cunningham's assertion that his own statements are not actionable under the tort of fraudulent misrepresentation warrants another look.

In the FAC, Cunningham is only listed as causing Plaintiffs to purchase Boxes from Data Tech on one occasion.  (Doc. No. 67 ¶ 135–36.)  Specifically, Plaintiffs claim that—in addition to the solicitation from Joseph Jacobs and Michael Boothe—their May 2024 purchases relied on "the representation made by Defendant Cunningham that Plaintiffs would receive significantly more revenue from each new Box going forward."  (Id. ¶ 136.)  According to Cunningham's April 26, 2024 letter to WG customers, a new type of Box collected more data than its older counterpart, resulting in more lucrative monthly payments for End Users.  (Id. ¶ 131, Ex. F.)  Encouraged by Cunningham's letter, Plaintiffs allege that they purchased two Boxes just one

82

month later from Data Tech.  For this reason, Plaintiffs have plausibly alleged fraudulent

misrepresentation against Cunningham that led to their purchase of Boxes from Data Tech.[43]

### 2.  Data Tech Defendants and United Defendants

In their Motions to Dismiss, Data Tech—with the Boothe brothers—and United—with

Eric Howlett—make similar arguments on Count II.  Specifically, they argue that (1) Plaintiffs

have not pled sufficient facts to infer knowledge of fraudulent misrepresentations, and (2) the

instances alleged to be misrepresentations are not pled with the specificity required of Rule 9(b).

(See Doc. No. 22 at 16–18; Doc. No. 79 at 9–10; Doc. No. 84 at 30.)  On the knowledge

requirement, the Court addressed similar arguments when finding Plaintiffs sufficiently alleged

United and Data Tech had knowledge of the fraudulent scheme when committing RICO

predicate acts.  The same analysis applies here.  Namely, the reasons for inferring knowledge

include (1) Data Tech and United principals had a monetary motive to misrepresent the value of

Boxes, (2) they had access to WG's internal computer system that monitored Box information,

(3) Eric Howlett's role as Box installer across the country gave him an elevated role in the

scheme, (4) Michael Boothe had a close personal relationship with Dwayne Ratliff, and (5) the

Boothes later siphoned money from Plaintiffs' Box purchases to avoid liability.

Likewise, United and Data Tech's second argument has a familiar refrain:  Plaintiffs'

specific averments of fraudulent statements fall short of Rule 9(b)'s pleading standard.  But Rule

---

[43]  For fraudulent concealment, a defendant with no contractual or fiduciary duty is not liable
for his mere silence, but may be liable for his active concealment.  As explained above,
active concealment involves a defendant's intentional actions to conceal the truth from
another party.  See Gnagey, 82 A.3d at 503.  Two of Cunningham's actions are relevant here:
(1) Cunningham's visit to New Jersey to boost Plaintiffs' confidence in the Pattern of Life
Program;  and (2) his April 26, 2024 letter, which touted new Box technology despite the
impending collapse of the WG Ponzi scheme.  Both of those actions could plausibly give rise
to the inference that he intended to deceive Plaintiffs to purchase more Boxes.  Therefore, the
"concealment" portion of Count II will not be dismissed.

9(b) is not an impenetrable wall.  As the Third Circuit has held, "the requirements of rule 9(b) may be satisfied if the complaint describes the circumstances of the alleged fraud with 'precise allegations of date, time, or place' or by using some means of 'injecting precision and some measure of substantiation into their allegations of fraud.'"  Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 172 n.10 (3d Cir. 2002) (emphasis in original) (internal citations omitted).

Plaintiffs' averments in the FAC against Data Tech Defendants and United Defendants exceed this standard.  The Court need only address a few.  For example, the FAC includes the following:  (1) on November 7 and 8, 2023 in Wisconsin, Eric Howlett and Michael Boothe showed Plaintiffs misleading revenue statements and held a Zoom call with Plaintiffs' friends and family to induce Plaintiffs to purchase Boxes;  (2) Michael Boothe met Plaintiffs at a steakhouse in Philadelphia on December 18, 2023 to solicit investments;  (3) the Boothe brothers and Eric Howlett solicited Plaintiffs at a restaurant in Atlantic City on December 19, 2023;  and (4) David Boothe solicited Plaintiffs in January 2024 at a meeting in Miami.  (Doc. No. 67 ¶ 97, 98, 111, 113.)  These allegations "inject precision" into Plaintiffs' fraud claim, and provide United and Data Tech with adequate notice of their misconduct.  See Foodtown, 296 F.3d at 172 n.10 (describing the policy behind Rule 9(b) as "provid[ing] defendants with notice of the precise misconduct that is alleged.") (internal citation omitted).[44]  As a result, Plaintiffs' second fraud claim (Count II) is adequately pled as to all Moving Defendants.

---

[44]  To further make their point, Data Tech Defendants and United Defendants provide a line-by-line analysis of the sufficiency of each purported misrepresentation, frequently claiming that the allegation does not specify which "Plaintiff" received the misrepresentation.  (See Doc. No. 84 at 8–13; Doc. No. 22 at 18–19.)   Plaintiffs are LLCs with a total of two members.  The inference is that each one received the misrepresentation, which is more than sufficient under Rule 9(b).

**b. Negligent Misrepresentation (Count III)**

In addition to their fraudulent misrepresentation and concealment claims, Plaintiffs plead in the alternative a negligent misrepresentation claim (Count III) against all Defendants.[45] Under Pennsylvania law, the elements for a negligent misrepresentation claim are "(1) a misrepresentation of a material fact; (2) made when defendant ought to have known its falsity; (3) with intent to induce another to act on it; and (4) which causes injury to a party acting in justifiable reliance on the misrepresentation." McGrain v. C.R. Bard, Inc., 551 F. Supp. 3d 529, 544 n.14 (E.D. Pa. 2021) (citing Bilt–Rite, 866 A.2d at 277). Negligent misrepresentation shares three of its four elements with fraudulent misrepresentation, including (1) material misrepresentation, (2) intent to induce a party to rely on the misrepresentation, and (3) damage to a party from his or her justifiable reliance on the misrepresentation. See Fort Washington Res., Inc. v. Tannen, 858 F. Supp. 455, 461 (E.D. Pa. 1994).

Here, Plaintiffs rely on the same statements used in their fraud claims as the basis for their negligence claim, only modifying the applicable state of mind. (Doc. No. 67 ¶ 208–14.) As expected then, Moving Defendants' allegations of insufficiency on this claim resemble their arguments on the fraud claims. The Court will address each argument below.

- First, James Cunningham argues that no actionable statements can be attributed to him. But, as the Court already found in its analysis of both fraud claims, Cunningham did make two statements, which Plaintiffs plausibly allege induced their reliance and caused them damages when they later purchased Boxes from JPC and Data Tech.

---

[45] Plaintiffs are permitted to plead alternative or inconsistent claims. See Fed. R. Civ. P. 8(d).

- Second, JPC Defendants assert that the economic loss doctrine bars Plaintiffs' negligence claim, but the Court already rejected that argument in the context of the fraud claim. Similarly, the Court already addressed JPC Defendants' contention that Joseph Jacobs, Anthony Amado, and Barry Caldwell cannot be individually liable for tort claims because they were acting solely in their corporate, not individual, capacities. However, they can be liable on claims as individuals, even when acting as representatives of a corporation.

- Third, United Defendants' argument on negligent misrepresentation repeats the same "lack of knowledge" argument previously made, highlighting that the FAC lacks "circumstances which would have put Howlett in a position to have known the alleged falsity." (Doc. No. 22 at 32–33.) Because Plaintiffs have alleged sufficient facts to infer knowledge of both the RICO and fraud claims, the lower threshold of negligence as a state of mind is satisfied here. Even if Eric Howlett did not actually know the truth about WG, which the facts alleged support the inference that he did know, then his (1) integral role in the scheme, (2) access to WG's internal computer system, and (3) receipt of exorbitant payments from WG—including $1 million "for just the month of November [2023]"— should have put him on notice of the WG Ponzi scheme before he solicited Plaintiffs to purchase Boxes.

- Finally, Data Tech Defendants make essentially the same argument as United, claiming they had no "opportunity to learn that any statements made by [WG] were false." (Doc. No. 84 at 28.) But the Court can plausibly infer Data Tech Defendants' negligence due to Data Tech's proximity to Dwayne Ratliff, joint access to WG's computer system, control over the Pattern of Life Program, and exorbitant profits. Accordingly, Count III states a claim upon which relief can be granted. See Tannen, 858 F. Supp. at 461–62 (finding

86

genuine dispute of material fact on plaintiff's negligent misrepresentation claim relying on

same body of evidence as plaintiff's fraudulent misrepresentation claim, upon which the

court had earlier denied defendant's summary judgment).

### c. Breach of Contract (Counts VI, VII)

#### i. JPC Breach of Contract (Count VI)

In Count VI of the FAC, Plaintiffs claim that JPC breached their oral contract to deliver

Boxes on time.[46]  Of the 33 Boxes purchased from JPC, Plaintiffs specifically point to ten Boxes

that were delivered untimely, and four Boxes that were never delivered.  (Doc. No. 67 ¶ 264–65.)

Under Pennsylvania law, a breach of contract claim involves three elements:  "(1) the

existence of a contract, including its essential terms, (2) breach of the contract; and (3) resultant

damages."  Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone

Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016).  JPC does not contest the breach or damages

elements, but only disputes whether Plaintiffs have sufficiently pled the existence of a contract.

A contract forms when there is an offer and an acceptance, sufficiently definite terms, and

consideration.  See Ruggiero v. Nocenti, 556 F. Supp. 3d 512, 522 (E.D. Pa. 2021).

Viewing the facts alleged in the FAC in the light most favorable to Plaintiffs, they have

plausibly alleged the existence of a contract with JPC.  After months of solicitation and

negotiation, JPC consummated an oral contract with Plaintiffs on September 24, 2023 that

governed Box purchases.  The terms included the following:  Plaintiffs would pay $115,000 per

Box, including installation fees, and JPC would deliver and install Boxes within 45 days after

purchase.  (Doc. No. 67 ¶ 86.)  These terms show a contract was formed.  First, through the

---

[46]  The sole defendant named in Count VI is JPC.  Pacific Outdoors, Jacobs, Amado, and
Caldwell are not named.  Further, Plaintiffs acknowledge that only Plaintiff Teometrix LLC
was a party to JPC's contract.  (Doc. No. 93 at n.13.)

negotiation of these terms and their final agreement, both parties manifested an intent to be bound by the oral contract. Second, the parties' oral contract contained essential terms, such as price, consideration, and performance obligations. Third, the consideration was acknowledged and, in fact, Plaintiffs paid for the Boxes. Moreover, the existence of a contract is further demonstrated by the parties' continued reliance on it when Plaintiffs purchased additional Boxes on September 27, 2023 and December 4, 2023. See (Id. ¶ 87, 104.); Ruggiero, 556 F. Supp. 3d at 522 (quoting 13 Pa. C.S. § 2204(a)) ("A contract for the sale of goods 'may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.'"). Thus, Plaintiffs' contract claim in Count VI will not be dismissed. See Glover v. Junior, 333 A.3d 323, 339 (Pa. 2025) (noting that the existence of an oral contract implicates questions of fact).

### ii. Data Tech Breach of Contract (Count VII)

In Count VII of the FAC, Plaintiffs claim that Data Tech breached the parties' oral contract to deliver Boxes in a timely fashion.[47] Specifically, Plaintiffs allege that Data Tech failed to deliver any of the fifteen (15) Boxes purchased in 2024. (Doc. No. 67 ¶ 274.) Data Tech makes two arguments to the contrary: (1) Plaintiffs fail to allege the formation of a contract because the contract lacked essential terms, such as time of performance and price; and (2) Plaintiffs fail to plead the breach element because they refused to accept delivery of Boxes in June 2024. (Doc. No. 84 at 37–38.)

First, Plaintiffs have alleged enough facts to infer the existence of their contract with Data Tech. As stated above, a contract must have essential terms to be enforceable. See Meyer, 137

---

[47] The sole Defendant in Count VII is Data Tech, not David or Michael Boothe. Further, Plaintiffs acknowledge that only Plaintiff Teometrix LLC was a party to Data Tech's contracts. (Doc. No. 94 at n.10.)

A.3d at 1258.  Data Tech primarily argues that there is no time by which Boxes had to be delivered, so finding breach of contract based on untimely delivery would be unwarranted.  As a threshold matter, Pennsylvania law does not mandate that an enforceable contract for goods include a provision for time of performance—even if the term is found to be "essential."  See 13 Pa. C.S. § 2309 (providing that, if a contract includes no provision on time for performance, it "shall be a reasonable time."); see also Ruggiero, 556 F. Supp. 3d at 523 ("[T]he fact that an agreement omits an essential term . . . does not negate contract formation so long as the parties otherwise manifested their mutual assent to the agreement and the terms of that agreement were sufficiently definite.").  And the parties' contract—as well as their several amended contracts— included sufficiently definite terms like specific per-Box price and the quantity of Boxes to be delivered.[48]  (See Doc. No. 67 ¶ 115, 120, 124, 136.)  Additionally, the parties' course of performance demonstrates a contractual duty to "timely deliver" Boxes.  Specifically, the FAC notes that (1) Data Tech knew Plaintiffs had paid fees to reserve specific locations for their Boxes, and (2) Data Tech "promised Plaintiffs" that these reservations were effective for 90 days.  (See Doc. No. 67 ¶ 127.)  At the very least, Data Tech understood its agreement to "timely deliver" Boxes within 90 days.  Finally, when Plaintiffs complained about late deliveries, David Boothe promised that he would remedy the situation, implying that he understood the contract to include a timeliness obligation.

Data Tech's final argument is that Plaintiffs fail to sufficiently plead the breach element because Plaintiffs refused to accept Boxes once they were available.  However, the FAC does not

---

[48]  Defendants also argue there was no contract between the parties because the price of Boxes changed so frequently.  However, Plaintiffs have alleged facts—which the Court must accept as true—that the fluctuations in price were due to various agreed-upon amendments to the parties' contracts.

state that they rejected Boxes.  It merely provides that Data Tech told Plaintiffs that their Boxes were finally available after the WG Ponzi scheme had been revealed to all End Users.  (See Doc. No. 67 ¶ 145.)

### d.  Aiding and Abetting Fraud (Count VIII)

In Count VIII of the FAC, Plaintiffs claim that all Defendants aided and abetted one another's fraud.  (Doc. No. 67 ¶ 278–85.)   In Pennsylvania, the tort of aiding and abetting fraud has three elements: (1) fraud committed by a third party, (2) actual knowledge of that fraud, and (3) substantial assistance or encouragement provided to the third party.  See Marion v. Bryn Mawr Tr. Co., 288 A.3d 76, 87, 89 (Pa. 2023).  In Pennsylvania, actual knowledge "is not an insurmountable burden for plaintiffs," and can be inferred through circumstantial evidence or willful blindness.  Id. at 91.  Nor does the Plaintiff have to "understand the full legal significance of the facts, or all the details of the primary wrongdoing."  Id. (quoting Restatement (Third) of Torts: Liab. for Econ. Harm, § 28 Cmt. c.).  In contesting the sufficiency of the aiding and abetting fraud claim, Moving Defendants advance similar arguments made in challenging the sufficiency of the fraud and RICO claims.

- First, United Defendants contend that they lacked knowledge of the WG fraudulent scheme, which the Court has already found unconvincing.  (Doc. No. 22 at 32–33.)  To the extent they argue the heightened pleading standards of Rule 9(b) bar this claim because Eric Howlett's comments were not pled with specificity, their argument is equally unavailing.  (See id. at 15–20.)  To clarify, the fraud at issue in an aiding and abetting claim is not the defendant's fraud, but rather another party's fraud.  Given that Plaintiffs plausibly alleged fraudulent misrepresentation claims and RICO violations based in part on mail and wire fraud against other Defendants, and United Defendants'

90

complicity with those Defendants, Plaintiffs have sufficiently alleged the element of a third party's fraud.

- Second, James Cunningham asserts the same "lack of knowledge" ground the Court has already addressed.  He also states that there are "no allegations that Cunningham substantially encouraged Messrs. [Dwayne] Ratliff and [Jason] Dumas to commit fraud, or had any connection whatsoever with the reseller network."  (Doc. No. 81 at 34–35.) But in Cunningham's own letter, he claims to have assisted WG for several years, including first as a "part-time reseller" and as a "part time-consultant . . . providing Jason [Dumas] and others with additional depth," and then in his three full-time officer roles working on the Pattern of Life Program.  (See Doc. No. 67 Ex. F.)  These admissions alone are enough to infer that Cunningham provided substantial assistance to, at least, the other WG Defendants.

- Third, JPC Defendants contend that they, too, lacked knowledge of WG's fraud.  (Doc. No. 82 at 23–24.)  But their possession of the Intel contract, along with their recalcitrance to provide the Intel contract to Plaintiffs and their coordination with other Defendants is sufficient to infer knowledge.  Additionally, their persistent solicitation of Plaintiffs and other End Users to purchase Boxes provided substantial assistance to the WG Ponzi scheme.  In addition, JPC Defendants argue that some of their statements to Plaintiffs— including the screenshot of Box revenue—were not technically false or misleading.  But the falsity or misleading nature of a particular statement is not necessary to state a claim under this tort, which only requires "substantial assistance"—regardless of whether that assistance involves misrepresentations—as long as there is a fraud committed by a third party.

91

- Finally, Data Tech Defendants stress that the "actual knowledge" requirement for aiding and abetting fraud is fatal to Plaintiffs' claim. (Doc. No. 84 at 37–40.) The Court previously found that Data Tech' involvement in the WG Ponzi scheme is sufficient to infer knowledge of its fraudulent nature.[49]

Accordingly, Plaintiffs have plausibly alleged that Defendants aided and abetted fraud, so Count VIII will not be dismissed.

### e. Civil Conspiracy (Count IX)

Plaintiffs' final claim is that all Defendants were part of a civil conspiracy to achieve "a common lawful purpose: to extract money from Plaintiffs and other End Users through [WG's] Ponzi scheme." (Doc. No. 67 ¶ 287.) Under Pennsylvania law, "to state a claim for civil conspiracy a plaintiff must show the following: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." Zehring v. Sorber, No. CV 20-3195, 2024 WL 233217, at *22 (E.D. Pa. Jan. 22, 2024) (quoting Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008)). Civil conspiracy "must be based upon an independent underlying civil cause of action." NRA Grp., LLC v. Durenleau, 154

---

[49] To support their claim of lack of knowledge, Data Tech Defendants rely on cases from this District to make their point. (Doc. No. 84 at 38–40) (citing Hedden v. Navy Fed. Credit Union, No. 24-cv-3254, 2024 WL 4609585, at *6 (E.D. Pa. Oct. 29, 2024); Downz v. Citizens Bank, N.A., No. 24-cv-1529, 2024 WL 4829719 (E.D. Pa. Nov. 19, 2024); Newtek Small Bus. Fin., LLC v. Texas First Cap., Inc., No. 22-cv-2461, 2025 WL 439434, at *7 (E.D. Pa. Feb. 7, 2025)). However, none of these cases negate the Pennsylvania Supreme Court's holding in Marion that circumstantial facts may be used to infer actual knowledge. Hedden and Downz featured allegations that defendant had been exposed to another's fraud, which was sufficient to infer knowledge. On the other hand, in Newtek, the court dismissed a claim for aiding and abetting a breach of fiduciary duty—not a claim for aiding and abetting fraud—with far fewer facts to infer knowledge than are alleged in the present case.

92

F.4th 153, 172 (3d Cir. 2025) (citing Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 418 (E.D. Pa. 2009)).  In addition, "[a] plaintiff must show 'proof of malice'—that the conspiracy was committed with 'intent to do an unlawful act by unlawful means' and 'an intent to injure . . . absent justification.'"  Id. (quoting Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979)).  Malice "is a demanding standard: malicious intent must be the 'sole purpose' of the conspiracy."  Id.  Because Moving Defendants' arguments overlap, the Court will analyze each argument below.

Insofar as Moving Defendants maintain that there is no "underlying tort" action that forms the basis of the conspiracy, that argument fails.  (See Doc. No. 22 at 35, Doc. No. 81 at 33–34; Doc. No. 84 at 33.)  Here, Plaintiffs have plausibly pled fraudulent misrepresentation against all Moving Defendants, which (1) constitutes the underlying tort, and (2) given their conduct resulting in the fraudulent misrepresentation, satisfies the overt act requirement for each Defendant.  Next, James Cunningham and the three JPC-related individual Defendants argue that they did not combine, nor could not have combined, with others in a conspiracy.  (Doc. No. 81 at 33–34; Doc. No. 82 at 27.)  Cunningham's alleged participation in the WG Ponzi scheme has been described at great length, supra.  Despite Cunningham's attempt to distance himself from the JPC and Data Tech resellers, Plaintiffs have (1) attached a letter where Cunningham emphasized his longtime role in WG sales, and (2) plausibly alleged that he assisted JPC and Data Tech at an in-person event to solicit business from new investors, and even from Plaintiffs.

Furthermore, JPC claims that Anthony Amado, Barry Caldwell, and Joseph Jacobs must be dismissed from this case because a corporation cannot conspire with its own employees. Plaintiffs, however, are not alleging these three Defendants conspired with JPC; they are alleging they conspired with other Defendants in the case.

93

United Defendants, JPC Defendants, and Data Tech Defendants make a final argument. Specifically, they contend that Plaintiffs' civil conspiracy claim does not contain sufficient factual allegations to infer malicious intent. Defendants claim that the "malice" element—which Pennsylvania courts have defined as an "intent to injure"—requires that the conspiracy's "sole purpose was to cause harm to Plaintiffs. (See, e.g., Doc. No. 22 at 34) (citing Thompson Coal, 412 A.2d at 472). For their part, Plaintiffs do not claim that the conspiracy's sole purpose was to harm Plaintiffs. (See, e.g., Doc. No. 67 ¶ 287, 290) (stating that the "unlawful purpose" was "to extract money from Plaintiffs and other End Users" and to "enrich[] themselves at the expense of Plaintiffs and other End Users.") But Plaintiffs point to other cases holding that the "sole purpose of harming plaintiff" standard is not the correct one to be used when interpreting malice. (Doc. No. 93 at 33–34.)

Wading into the parties' debate over the meaning of malice and "intent to injure" is unnecessary at the Motion to Dismiss stage. A Ponzi scheme, like the one alleged by Plaintiffs, produces a class of injured parties whose investments were obtained through fraud. In this case, End Users like Plaintiffs are alleged to be victims who suffered financial harm due to the intentional actions of Defendants. Defendants' motive for engaging in these acts was to enrich themselves. As a result, Plaintiffs' civil conspiracy claim (Count IX) will not be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Moving Defendants' Motions to Dismiss the FAC (Doc. Nos. 79, 81, 83, 84) will be denied.  The claims remaining in the case are as follows:

- Count I:  fraudulent misrepresentation and concealment against Wireless Guardian, SWS, Dwayne Ratliff, James Cunningham, JPC, Pacific Outdoor, Joseph Jacobs, Barry Caldwell, Anthony Amado;

- Count II:  fraudulent misrepresentation and concealment against Wireless Guardian, SWS, Dwayne Ratliff, James Cunningham, Data Tech, United, Michael Boothe, David Boothe, Eric Howlett;

- Count III:  negligent misrepresentation against all Defendants;

- Count IV:  violation of RICO Act (18 U.S.C. § 1962(c)) against all Defendants;

- Count V:  conspiracy to violate RICO Act (18 U.S.C. § 1962(d)) against all Defendants;

- Count VI:  breach of contract against JPC;

- Count VII:  breach of contract against Data Tech;

- Count VIII:  aiding and abetting fraud against all Defendants; and

- Count IX:  civil conspiracy against all Defendants.

An appropriate Order follows.